**Samuel GIBSON, III, Plaintiff-Appellee,**

**v.**

**Walter D. ZANT, Superintendent, Georgia Diagnostic & Classification Center, Defendant-Appellant.**

**No. 82–8651.**

United States Court of Appeals, Eleventh Circuit.

May 31, 1983.

---

Virginia H. Jeffries, Staff Asst. Atty. Gen., Atlanta, Ga., for defendant-appellant.

Joseph M. Nursey, Atlanta, Ga., for plaintiff-appellee.

Before JOHNSON and ANDERSON, Circuit Judges, and COLEMAN *, Senior Circuit Judge.

---

* Honorable James P. Coleman, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

JOHNSON, Circuit Judge:

Respondent Walter D. Zant, Warden, Georgia Diagnostic & Classification Center, appeals the district court's grant of the writ of habeas corpus to petitioner Samuel Gibson, III. 547 F.Supp. 1270 (M.D.Ga.1982). Because the district court correctly concluded that petitioner's grand and trial juries were drawn from a venire which unconstitutionally excluded women and blacks, we affirm.

Gibson, a black male, challenged the composition of the grand and petit jury lists at a pretrial hearing held on May 1, 1975. When Gibson's pretrial challenge to the jury composition was rejected by the state trial court, he moved for an immediate appeal to save the public expense of proceeding to trial. The court denied the motion. Gibson, who had confessed to the crimes for which he was indicted, was tried and convicted on May 13–14, 1975, of raping and murdering a young woman in Jones County, Georgia.[1] The conviction was affirmed on direct appeal by the Supreme Court of Georgia, although the sentence of death for rape was vacated and remanded for the imposition of a prison sentence. *Gibson v. State,* 236 Ga. 874, 226 S.E.2d 63, *cert. denied,* 429 U.S. 986, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976). Gibson's petition for a writ of habeas corpus was denied by the Superior Court of Butts County, Georgia. The Supreme Court of Georgia affirmed the denial of the writ. *Gibson v. Ricketts,* 244 Ga. 482, 260 S.E.2d 877 (1979), *cert. denied,* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980). Having exhausted his state remedies, Gibson filed a petition for habeas relief in federal district court. In an opinion which not only thoroughly discussed the facts of this case but also detailed the history of Supreme Court decisions relating to jury composition challenges, with particular emphasis on those involving Georgia, the district court granted the writ on September 24, 1982.

■ At the pretrial hearing on the jury composition issue, both parties stipulated to figures showing the breakdown by race, sex, and age of the grand and petit jury lists that were compiled in August 1974 and the 1970 census figures[2] for Jones County, Georgia. These figures indicate disparities[3] of –37.92% and –31.62% between the percentage of women in Jones County and the percentage of women on the lists for the grand and petit juries, respectively.

---

1. The jury that convicted Gibson was all white and all male.

2. The use of five-year-old census data is appropriate when there is no evidence that use of the data distorted the actual number of women or blacks in Jones County at the time of trial. The Supreme Court has approved the use of six-year-old census data. *Duren v. Missouri,* 439 U.S. 357, 365 & n. 24, 99 S.Ct. 664, 669 & n. 24, 58 L.Ed.2d 579 (1979); *Alexander v. Louisiana,* 405 U.S. 625, 627, 92 S.Ct. 1221, 1223, 31 L.Ed.2d 536 (1972).

3. The disparities are taken from the figures contained in the district court's opinion. The district court calculated the disparities based on the information contained in the charts below. An analysis of the 1975 grand jury list by sex and race compared to the 1970 census for Jones County shows:

| Total | Men | Women | White | Black |
|---|---|---|---|---|
| 412 | 357 | 55 | 339 | 73 |
| % of Total | 86.70% | 13.30% | 82.30% | 17.70% |
| Census | 48.78% | 51.22% | 61.41% | 38.59% |
| Disparity | +37.92% | –37.92% | +20.89% | –20.89% |

547 F.Supp. at 1274. An analysis of the 1975 trial jury list by sex and race compared to the 1970 census for Jones County reveals:

| Total Known | Men | Women | White | Black |
|---|---|---|---|---|
| 1,475 | 1,186 | 289 | 1,207 | 268 |
| % of Total | 80.40% | 19.60% | 81.80% | 18.20% |
| Census | 48.78% | 51.22% | 61.41% | 38.59% |
| Disparity | +31.62% | –31.62% | +20.39% | –20.39% |

*Id.* at 1274–75. Some of the calculations of percentages contained in the above charts differ slightly from the calculations reported in the pretrial hearing and from those discussed in the opinion of the Georgia Supreme Court, *Gibson v. State,* 236 Ga. 874, 879, 226 S.E.2d 63, 67 (1976). However, the actual figures for the number of persons in each group on the list are the same in all three instances. The differences in the calculations of percentages therefore appear to be the result of an error in computation made by petitioner's counsel before the pretrial hearing in 1975, inasmuch as the district court's computations are correct. In any case, the differences do not affect the disposition of this appeal because they are not significant. Moreover, appellant does not dispute the figures contained in the above charts.

The disparity between the number of blacks in the population and on the grand and petit jury lists is –20.89% and –20.39%, respectively. When the parties originally stipulated to these figures, their agreement included an allowance for error of ± 5%. However, the district court requested both parties to supplement the record in order to ascertain the composition of the venires without provision for any error. After an examination of the jury lists by the District Attorney of the Jones County Superior court, the respondent advised the district court that there was no ascertainable error in the figures originally presented at the pretrial hearing. The district court therefore found that the figures contained in footnote three, *supra*, were an accurate summary of the 1975 Jones County grand and petit jury lists. 547 F.Supp. at 1274. In addition to stipulating to the composition of the 1975 jury lists, the parties also stipulated that there was at least as much discrepancy in the proportion of women and blacks on the lists for the previous ten years.

■ Gibson alleged that the grand and petit jury lists were unconstitutionally composed because both women and blacks were underrepresented. The importance of having a jury represent all portions of the community has often been expounded on in judicial decisions. The Supreme Court described the subtle but significant impact of discriminatory jury composition:

> When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable.... [The] exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.

*Peters v. Kiff,* 407 U.S. 493, 503, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83 (1972). The importance of non-discriminatory jury composition is magnified in capital cases, where juries are required to consider "*as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (emphasis in original).

■ Discriminatory selection of grand and petit juries in state courts may be challenged under the equal protection clause of the Fourteenth Amendment, *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), while the right to have a jury venire represent a fair cross-section of the community is also protected by the Sixth Amendment's guarantee of trial by an impartial jury. *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The prima facie tests for an equal protection claim and a fair-cross-section claim are almost identical.[4] In *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), the Supreme Court summarized the requirements for proving an equal protection violation:

> The first step is to establish that the group is one that is a recognizable, distinct class,.... Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time.... Finally, ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.

In *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), the elements of a prima facie violation of the fair-cross-section requirement were set out:

---

4. The two analyses differ, however, in the way the prima facie case is rebutted. Compare *Castaneda v. Partida,* 430 U.S. at 497–98, 97 S.Ct. at 1281–1282 (prima facie case rebutted by proving absence of discriminatory intent) with *Duren v. Missouri,* 439 U.S. at 367–68, 99 S.Ct. at 670 (prima facie case rebutted by proving

significant governmental interest justifying the imbalance of classes). See *Machetti v. Linahan,* 679 F.2d 236, 241 n. 6 (11th Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983); *United States v. Perez-Hernandez,* 672 F.2d 1380, 1384 n. 5 (11th Cir.1982). This distinction is not important for this case.

[T]he defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

■ The first part of the prima facie test under *Castaneda* or *Duren* is clearly satisfied in this case because both black persons, *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1879), and women, *Taylor v. Louisiana, supra,* constitute recognizable, distinct classes.

■ Although the Supreme Court has been careful not to delineate precise mathematical standards for proving systematic exclusion, *Alexander v. Louisiana, supra,* 405 U.S. at 630, 92 S.Ct. at 1225, Supreme Court, Fifth Circuit,[5] and Eleventh Circuit precedent furnish guidance in judging whether the disparities here are significant enough to establish an equal protection or fair-cross-section claim. It is evident that the disparities present here, ranging from 20% to 38%, are well within the range of disparities found significant in other cases.[6] *E.g., Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 532 (1970) (23% dispar-

ity); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (14%); *Machetti v. Linahan,* 679 F.2d 236 (1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983) (36% and 42%); *Porter v. Freeman,* 577 F.2d 329 (5th Cir.1978) (20.4%). In addition, the stipulation that the disparities in the 1975 lists were at least as great as those for the previous ten years buttresses the conclusion that the disparity is not due to chance or inadvertence but results from discrimination.

The third part of the prima facie test is also met here because petitioner demonstrated that the selection procedures used by the jury commissioners of Jones County were "not racially [or sexually] neutral" and were "susceptible of abuse." *Castaneda v. Partida, supra,* 430 U.S. at 494, 97 S.Ct. at 1280. Georgia law, § 59–106,[7] in effect when the 1975 Jones County jury lists were compiled, sets out the procedure to be followed by jury commissioners in composing a jury list:

At least biennially, or, if the senior judge of the superior court shall direct, at least annually, the board of jury commissioners shall compile and maintain and revise a jury list of intelligent and upright citizens of the county to serve as jurors. In composing such list the commissioners shall select a fairly representa-

---

**5.** Decisions of the Fifth Circuit handed down prior to September 30, 1981, are binding precedent on this Court unless and until overruled or modified by this Court en banc. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**6.** The Supreme Court of Georgia apparently ignored this clear precedent in ruling on the adequacy of the statistical disparity. On direct appeal, the Supreme Court of Georgia held that the "jury [was] composed of a representative cross section of the population of Jones County...." 236 Ga. at 881, 226 S.E.2d at 68. It recited the figures for the grand jury list, but did not explain why the resulting disparities could be countenanced under existing Supreme Court precedent which had found similar disparities to be unconstitutional. It did not discuss the statistics for the petit jury. In Justice Ingram's dissent, he noted that the requirements of *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), and *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24

L.Ed.2d 532 (1970), had not been met. 236 Ga. at 883, 226 S.E.2d at 69. This issue was not discussed in the opinion issued by the Supreme Court of Georgia relating to petitioner's habeas claim. See *Gibson v. Ricketts,* 244 Ga. 482, 260 S.E.2d 877 (1979).

The basis for the original state trial judge's holding on this issue is unclear. After the petitioner had presented the stipulated disparities that he contended established a prima facie case, the trial judge stated, "I believe the burden would shift to the State ...," suggesting that he believed the petitioner had made out a prima facie case. However, after the state presented its evidence, which consisted solely of the testimony of the jury commissioners, the trial judge ruled that "both the Grand and Traverse Jury is [sic] a representative cross-section of the citizens of Jones County...."

**7.** The language of this section has been slightly modified and it has been renumbered as § 15 12–40 in the current Georgia Code.

tive cross-section of the intelligent and upright citizens of the county from the official registered voters' list of the county as most recently revised by the county board of registrars or other county election officials. If at any time it appears to the jury commissioners that the jury list, so composed, is not a fairly representative cross-section of the intelligent and upright citizens of the county, they shall supplement such list by going out into the county and personally acquainting themselves with other citizens of the county, including intelligent and upright citizens of any significantly identifiable group in the county which may not be fairly represented thereon.

After selecting the citizens to serve as jurors, the jury commissioners shall select from the jury list a sufficient number of the most experienced, intelligent and upright citizens, not exceeding two-fifths of the whole number, to serve as grand jurors. The entire number first selected, including those afterwards selected as grand jurors, shall constitute the body of traverse jurors for the county, except as otherwise provided herein, and no new names shall be added until those names originally selected have been completely exhausted, except when a name which has already been drawn for the same term as a grand juror shall also be drawn as a traverse juror, such name shall be returned to the box and another drawn in its stead.

1973 Ga.Laws, p. 485–86. As the district court noted, 547 F.Supp. at 1277, this section was enacted by the Georgia legislature in 1968, in an attempt to statutorily comply with decisions of the Supreme Court. The Supreme Court addressed the constitutionality of this particular provision in *Turner v. Fouche, supra.* It concluded that this system of selecting grand juries is not "inherently unfair," 396 U.S. at 355, 90 S.Ct. at 537, but noted the possibility of abuse. Furthermore, the Court warned that a disparity is particularly suspect when it "originate[s], at least in part, at the one point in the selection process where the jury commissioners invoke their subjective judgment

rather than objective criteria." 396 U.S. at 360, 90 S.Ct. at 540. Accord *Foster v. Sparks,* 506 F.2d 805, 810 (5th Cir.1975).

■■ The district court's description of the procedure employed by the jury commissioners of Jones County demonstrates that the disparity occurred at the point in the process when the commissioners selected names based on their subjective judgment about which individuals were intelligent and upright:

The jury commissioners—three white men, one white woman and two black men—were called as witnesses. Every commissioner testified that some citizens verbally asked to be excluded and likewise some asked to be included on the jury lists; those requests were generally honored. The commissioners, with some few exceptions, considered only those on the registered voters' list. The commissioners acknowledged knowing persons not on the registered voters' list and not on either jury list who would be good jurors, and acknowledged knowing persons on the registered voters' list who would be qualified to serve as jurors but were not included on either the grand or trial jury list. (Note Tr. at p. 38.) In preparing the lists the jury commissioners met jointly, went over every name on the registered voters' list, relied upon the knowledge of one or more commissioners as to each registered voter, and either included or excluded each registered voter from the jury lists.

547 F.Supp. at 1272–73 (footnotes omitted). This procedure, where the jury commissioners knew the sex and race of each name on the registered voters' list, is obviously not "facially neutral" as mandated by *Castaneda* and *Duren.* Nevertheless, appellant focuses his challenge on this portion of the prima facie test. Appellant does not dispute that the disparities found by the district court are significant; rather, he argues that statistics alone cannot establish a prima facie case of discrimination and that petitioner did not show that the disparity was due to "systematic exclusion." In making this argument, appellant emphasizes

*Duren*'s requirement that a defendant must show "that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri, supra,* 439 U.S. at 364, 99 S.Ct. at 668. Appellant's reliance on the particular phrase "systematic exclusion" is misplaced, for the *Duren* Court made clear that the third prong of its test is equivalent to the *Castaneda* test when it defined "systematic" as "inherent in the particular jury-selection process utilized." *Id.* at 366, 99 S.Ct. at 669. Petitioner proved that the underrepresentation resulting from the method used by the Jones County jury commissioners was "inherent in the particular jury-selection process utilized" because it was a system easily capable of being manipulated.

In rebuttal to the prima facie case, the state only offered the testimony of the jury commissioners that they had not discriminated on the basis of race or sex. However, the Supreme Court has repeatedly declared that such affirmations of good faith are "insufficient to overcome the prima facie case." *Whitus v. Georgia,* 385 U.S. 545, 551, 87 S.Ct. 643, 647, 17 L.Ed.2d 599 (1967); *Alexander v. Louisiana, supra,* 405 U.S. at 632, 92 S.Ct. at 1226; *Turner v. Fouche, supra,* 396 U.S. at 361, 90 S.Ct. at 540; *Norris v. Alabama,* 294 U.S. 587, 598, 55 S.Ct. 579, 583, 79 L.Ed. 1074 (1935).

The law governing discriminatory jury composition is well settled. The disparities stipulated to by the state in this case are clearly unconstitutional. As the district court correctly observed, "[i]nstead of proceeding 'full steam ahead' to try this petitioner, the trial judge could have found these lists unconstitutionally composed and ordered the jury commissioners of Jones County to immediately revise these jury lists in accordance with Georgia law and Supreme Court ... decisions." 547 F.Supp. at 1278. Now, eight years after petitioner's original trial, he must be reindicted and retried by juries drawn from constitutionally composed venires. Due regard for the petitioner's constitutional rights in the first instance would also have served the interests of the larger community in prompt prosecution and minimization of needless public expense.

The judgment of the district court is AFFIRMED.