**Curfew DAVIS, Plaintiff-Appellant,**

v.

**Walter D. ZANT, Warden, Georgia Diagnostic and Classification Center, Defendant-Appellee.**

No. 83–8244.

United States Court of Appeals, Eleventh Circuit.

Dec. 27, 1983.

Rehearing En Banc Granted March 6, 1984.

Joseph M. Nursey, Atlanta, Ga., for plaintiff-appellant.

Susan V. Boleyn, William B. Hill, Jr., Asst. Attys. Gen., Atlanta, Ga., for defendant-appellee.

Before FAY and KRAVITCH, Circuit Judges, and ATKINS *, District Judge.

FAY, Circuit Judge:

Petitioner, Curfew Davis, was convicted of murder in Georgia state court in 1974 and was sentenced to death for the murder charge. After an unsuccessful effort to obtain a writ of habeas corpus in state court, Davis brought this petition for a writ of habeas corpus under 28 U.S.C. § 2254 (1976). The district court denied the petition without holding an evidentiary hearing. We reverse and grant relief.

Davis raises nine issues before this court: (1) whether petitioner's sentencing trial was conducted before a jury whose composition violated the Sixth and Fourteenth Amendments; (2) whether prospective jurors at petitioner's sentencing trial were excluded in violation of *Witherspoon v. Illinois;* (3) whether the trial court's instruction to the jury during petitioner's 1974 culpability trial improperly shifted the burden of proof on

the element of malice; (4) whether petitioner's death sentence was based on an unconstitutional application of statutory aggravating circumstances; (5) whether petitioner was denied effective assistance of counsel at his 1974 culpability trial; (6) whether statements made by petitioner pursuant to police in-custody interrogations were unconstitutionally obtained; (7) whether the prosecutor's closing argument during the 1977 resentencing trial rendered petitioner's sentence fundamentally unfair; (8) whether petitioner's prior convictions were improperly admitted as aggravating circumstances in support of his death sentence; and (9) whether petitioner was denied due process of law and his right to an impartial judge due to the nature of the proceedings to disqualify the trial judge prior to petitioner's resentencing trial. The first issue is dispositive of this appeal.

PROCEDURAL HISTORY

Based upon a series of events occurring in and around LaGrange, Georgia on July 19, 1974,[1] Curfew Davis, a black male, was charged in the Superior Court of Troup County, Georgia with first-degree murder. The victim was a young white woman who had been temporarily in LaGrange on a work assignment to pick up laboratory supplies from the LaGrange Women's Clinic. The trial jury found Davis guilty of the murder charge and pursuant to the Georgia bifurcated trial procedure the jury recommended that Davis be sentenced to death. The trial judge subsequently entered findings and imposed the death sentence.

Davis appealed to the Supreme Court of Georgia which affirmed the convictions and the sentence. *Davis v. State,* 236 Ga. 804, 225 S.E.2d 241 (1976). The United States Supreme Court granted certiorari, vacated petitioner's death sentence due to a violation of the *Witherspoon* standards as to one prospective venireperson, and remanded for a new sentencing trial. *Davis v. Georgia,*

---

* Honorable C. Clyde Atkins, U.S. District Court Judge for the Southern District of Florida, sitting by designation.

1. The historical facts are set out in more detail in *Davis v. State,* 236 Ga. 804, 225 S.E.2d 241 (1976).

429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 ·(1976).

Petitioner was retried on the sentencing issue only in June 1977 and was again sentenced to death by a jury in the Superior Court of Troup County. The Supreme Court of Georgia affirmed, *Davis v. State*, 241 Ga. 376, 247 S.E.2d 45 (1978), and the United States Supreme Court denied certiorari. *Davis v. Georgia*, 439 U.S. 947, 99 S.Ct. 341, 58 L.Ed.2d 338 (1978).

Petitioner then filed a petition for writ of habeas corpus in the Superior Court of Butts County, Georgia, which was denied in April 1981. The Georgia Supreme Court denied an application for certificate of probable cause to appeal the judgment of the Superior Court, and the United States Supreme Court denied certiorari. *Davis v. Zant*, 455 U.S. 983, 102 S.Ct. 1491, 71 L.Ed.2d 692 (1982).

Davis then filed the present petition for writ of habeas corpus in the United States District Court for the Northern District of Georgia and thereafter filed a motion for an evidentiary hearing. The district court denied both the motion and the petition, and Davis appealed to this court.

The instant habeas petition raises issues with respect to petitioner's 1974 trial and his 1977 resentencing trial.

2. The use of five-year-old census data is appropriate when there is no evidence that use of the data distorted the actual number of women or blacks in Troup County at the time of trial. The Supreme Court has approved the use of six-year-old census data. *Duren v. Missouri*, 439 U.S. 357, 365 & n. 24, 99 S.Ct. 664, 669 & n. 24, 58 L.Ed.2d 579 (1979); *Alexander v. Louisiana*, 405 U.S. 625, 627, 92 S.Ct. 1221, 1223, 31 L.Ed.2d 536 (1972).

3. The disparities are taken from figures presented to the trial court which were drawn from the 1970 State of Georgia Census by the United States Department of Commerce and from the 1975 Troup County traverse jury lists. An analysis of the 1975 lists by sex and race as compared to the 1970 county census shows:

|  | Men | Women | White | Black |
|---|---|---|---|---|
| Census | 47.1% | 52.9% | 68.2% | 31.8% |
| % in Jury Pool | 65.5% | 34.5% | 86.3% | 13.7% |
| Disparity | +18.4% | −18.4% | +18.1% | −18.1% |

# I. THE JURY COMPOSITION CHALLENGE

Petitioner alleges that in his 1977 resentencing trial conducted in the Superior Court of Troup County he was sentenced by an unconstitutionally composed jury. Specifically, Davis alleges that both blacks and women were underrepresented in the 1975 Troup County traverse jury pool from which the jury that sentenced him was drawn.

At the pretrial hearing on the jury composition issue, uncontroverted evidence was introduced concerning the breakdown by race, sex and age of the 1975 traverse jury pool that was compiled in August 1975 and similar breakdowns in the 1970 census figures [2] for Troup County. These figures indicate disparities [3] of -18.4% between the percentage of women in Troup County and the percentage of women on the list for the traverse jury. The disparity between the number of blacks in the county population and those on the traverse jury list is -18.1%. Similar figures comparing the 1973 traverse jury pool with the 1970 census results indicate a disparity of -12.6% between the percentage of women in the county and their percentage on the 1973 list; [4] the disparity between the number of blacks in the population and their representation on the 1973 list is -18.1%.[5]

R.Vol. 4 at 53–56, 154–55.

4. The analytical breakdown of the 1973 traverse jury list as compared to the 1970 census figures shows:

|  | Men | Women | White | Black |
|---|---|---|---|---|
| Census | 47.1% | 52.9% | 68.2% | 31.8% |
| % in Jury Pool | 65.5% | 40.3% | 86.3% | 13.7% |
| Disparity | +12.6% | −12.6% | +18.1% | −18.1% |

R.Vol. 4 at 53–55, 154–55.

5. During the hearing, the trial court refused to accept any evidence concerning the composition of the grand jury pools in Troup County; the court held such evidence to be irrelevant to a traverse jury challenge. R.Vol. 4 at 73–74. Petitioner sought to introduce this evidence as further proof of discrimination in the composition of the county's jury pools and as further evidence of the intent to discriminate on the part of the jury commissioners, who were responsible for compiling both the grand jury and traverse jury pools. R.Vol. 4 at 73–74; Vol. 5

**1482**

The importance of having a jury represent all portions of the community has often been emphasized in judicial decisions. *See, e.g., Peters v. Kiff,* 407 U.S. 493, 503, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83 (1972). The importance of affording a defendant trial by a representative jury of his peers is magnified in capital cases, where juries are required to consider "*as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (emphasis in original).

█ Discriminatory selection of grand and traverse juries in state court may be challenged under the equal protection clause of the Fourteenth Amendment, *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). The right to have a jury venire represent a fair cross-section of the community is also protected by the Sixth Amendment's guarantee of trial by an impartial jury. *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The prima facie tests for an equal protection claim and a fair-cross-section claim are almost identical.[6] In *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), the Supreme Court summarized the requirements for proving an equal protection violation:

> The first step is to establish that the group is one that is a recognizable, distinct class, .... Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time.... Finally, ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.

In *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), the elements of a prima facie violation of the fair-cross-section requirement were set out:

> [T]he defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

█ The first part of the prima facie test under *Castaneda* or *Duren* is clearly satisfied in this case because both black persons, *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1879), and women, *Taylor v. Louisiana, supra,* constitute recognizable, distinct classes.

Although the Supreme Court has been careful not to delineate precise mathematical standards for proving systematic exclusion, *Alexander v. Louisiana, supra,* 405 U.S. at 630, 92 S.Ct. at 1225, Supreme Court, Fifth Circuit,[7] and Eleventh Circuit precedent furnish guidance in judging whether the disparities here are significant enough to establish an equal protection or fair-cross-section claim. It is evident that the disparities present here, ranging from

---

at 64–65. We have serious doubts as to the exclusion of this evidence, as such figures could well buttress the conclusion that the disparity is not due to chance or inadvertence but results from discrimination. On these particular facts, however, such additional evidence is not essential to the disposition of the case.

6. The two analyses do differ in the way the prima facie case is rebutted. Compare *Castaneda v. Partida,* 430 U.S. at 497–98, 97 S.Ct. at 1281–1282 (prima facie case rebutted by proving absence of discriminatory intent) with *Duren v. Missouri,* 439 U.S. at 367–68, 99 S.Ct. at 670 (prima facie case rebutted by proving

significant governmental interest justifying the imbalance of classes). Because we conclude that the state's rebuttal consisted of mere affirmations of good faith which did not approach the threshold of either standard of proof, this distinction is not important for this case.

7. Decisions of the Fifth Circuit handed down prior to September 30, 1981, are binding precedent on this Court unless and until overruled or modified by this Court en banc. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

18.1% to 18.4% as to the critical 1975 traverse jury pool, are extremely close to the disparities found significant in other cases.[8] *E.g., Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) (23% disparity); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (14%); *Gibson v. Zant,* 705 F.2d 1543 (11th Cir.1983) (21% and 38%); *Machetti v. Linahan,* 679 F.2d 236 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983) (36% and 42%); *Porter v. Freeman,* 577 F.2d 329 (5th Cir.1978) (20.4%). In addition, the evidence that the disparities in the 1973 list were in the same range as those in the 1975 list corroborates petitioner's claim that the 1975 figures are not coincidental but result from discrimination.

The third part of the prima facie test is also met here because petitioner has demonstrated that the selection procedures used by the jury commissioners of Troup County were manifestly "susceptible of abuse" and were not "racially [or sexually] neutral." *Castaneda v. Partida, supra,* 430 U.S. at 494, 97 S.Ct. at 1280. Georgia Code § 59–106,[9] in effect when the 1975 Troup County jury lists were compiled, sets out the procedures to be followed by jury commissioners in composing a jury list:

> At least biennially, or, if the chief judge of the superior court shall direct, at least annually, the board of jury commissioners shall compile, and maintain, and revise a jury list of intelligent and upright citizens of the county to serve as jurors. In composing such a list the commissioners shall select a fairly representative cross-section of the intelligent and upright citizens of the county from the official registered voters' list of the county as most recently revised by the county board of registrars or other county election officials. If at any time it appears to the jury commissioners that the jury list, so composed, is not a fairly representative cross-section of the intelligent and upright citizens of the county, they shall supplement such list by going out into the county and personally acquainting themselves with other citizens of the county, including intelligent and upright citizens of any significantly identifiable group in the county which may not be fairly represented on the jury list.

The Georgia legislature, aware of the constitutional problems surrounding the selection of grand and traverse juries, enacted this section in 1968 in an attempt to statutorily comply with the decisions of the Supreme Court. We applaud the initiative of the legislature; however, as the Supreme Court explained in addressing the constitutionality of this particular provision in *Turner v. Fouche, supra,* the Georgia system of selecting juries, while not "inherently unfair", 396 U.S. at 355, 90 S.Ct. at 537, contains the possibility of abuse. Furthermore, the Court warned that a disparity is particularly suspect when it "originate[s], at least in part, at the one point in the selection process where the jury commissioners invoke[] their subjective judgment rather than objective criteria." 396 U.S. at 360, 90 S.Ct. at 540. *Accord Foster v. Sparks,* 506 F.2d 805, 810 (5th Cir.1975).

The testimony of the jury commissioners at petitioner's 1977 pre-trial hearing on the jury composition issue demonstrates that the 1975 jury selection procedure in Troup County did not comply with the dictates of Georgia law and Supreme Court decisions that a "fairly representative cross-section"

---

8. The Supreme Court of Georgia apparently ignored this precedent in ruling on the adequacy of the statistical disparity. On direct appeal, the Supreme Court of Georgia held that "given the neutral selection method primarily used by the Troup County jury commissioners, the statistical disparity between the percentage of blacks eligible for jury service and the percentage of blacks in the 1975 traverse jury list affords no ground for relief." 241 Ga. at 379–80, 247 S.E.2d at 48–49. The court recited the figures for the 1975 traverse jury list, but did not distinguish the present case from existing United States Supreme Court precedent which had found similar disparities to be unconstitutional. The court did not discuss the statistics as they related to women, nor did it discuss the 1973 pool.

9. The language of this section has been slightly modified and it has been renumbered as § 15–12–40 (1982) in the current Georgia Code.

of the county's citizens be selected for jury service. Six of the eight commissioners charged with selection of the 1975 pool testified. The commissioners stated that they were directed by the county clerk's office to utilize only the registered voters' list in selecting the jury pools. No commissioner could recall being given any indication of the statute's obligation to go beyond the voters' list if necessary to obtain a pool representative of the racial and sexual makeup of the community.[10] Our courts have sanctioned the use of voter registration lists as the sole means of jury selection. *See Turner v. Fouche, supra*, and *Foster v. Sparks, supra*; however, the use of such lists does not establish as a conclusive fact that a true cross-section of the community is being drawn.

The commissioners' testimony further demonstrates that the jury selection process was a system easily capable of being manipulated, and a system which is obviously not "facially neutral" as mandated by *Castaneda* and *Duren*. Although four of the six 1975 commissioners who testified, each of whom was responsible for selecting juries from a particular precinct, maintained that they used a random selection method in that they picked every fifth, or in some cases every sixth, name from the voters' list,[11] the fact remains that a significant proportion of the 4015 names on the list were selected through subjective means.

Specifically, Commissioner Julian Jones admitted that he, in corroboration with other commissioners, hand-picked 700 of the 4015 total persons on the 1975 pool by choosing persons that "we knew or thought would make a good juror."[12] Commissioner Lavinia Morgan initially testified that she chose every sixth name on her voters' list for inclusion in the pool. However, when it was pointed out to Ms. Morgan that at one point she had checked four names in a row, at another point had checked five names in a row and at still another point had checked sixteen consecutive names, she conceded that she had not in fact used a random method at all.[13] It was also appar-

---

**10.** *E.g.,* R.Vol. 4 at 168, 180–181; Vol. 5 at 65, 194–96.

**11.** R.Vol. 4 at 165–66, 168, 178–79, 191, 193–95, 205–07, 214.

**12.** Commissioner Jones' full testimony in this regard, on direct examination, was as follows:

Q. Can you tell me how you selected the 1975 list?
A. We went down the line and counted off numbers in sequence, the sixth one.
Q. All right, sir. And you did this by districts and not by the county at large; is that correct?
A. That's correct.
Q. What district did you do, sir?
A. The Mountville district. · Of course, we all went back together and checked over the list completely.
Q. What did you check over?
A. We didn't have enough names.
Q. All right. How did you do it?
A. We just went back and checked the names off of the people we knew or thought would make a good juror.
Q. And placed them in addition to the other jurors?
A. That's right. When we wound up we had 3,500 jurors.
Q. How many did you have the first time before you started putting in people you thought—

A. 2,800.
Q. And then the others, you just went through and selected people you thought would make good jurors?
A. That's right.
Q. And that's on the '75 list?
A. Yes.
Q. And on the '73 list?
A. We had enough. ·
Q. It was just in the '75 list that you put in the names you thought would make good—
A. We didn't have enough when we got through.

R.Vol. 5 at 8–9.

**13.** Commissioner Morgan gave the following testimony on direct examination:

Q. Would you tell me how you used those lists?
   *   *   *   *   *   *
A. We were told to get a certain number and I went down the list checking and when I didn't get enough, I went back and checked some more.
Q. All right. And these checks on the list, are those your checks? ·
A. I suppose so.
Q. All right. Tell me how you went down the list checking.
A. Well, it was suggested that we get maybe every sixth person so we'd be

ent from the commissioners' testimony that several of them knew the race and sex of many names on the registered voters' list; a procedure whereby these known factors can be easily incorporated as selection criteria is far from "facially neutral." [14] Moreover, the commissioners conceded in testimony that the prescribed method of choosing every sixth name produced only 2800 names. The commissioners then went back over the list in an attempt to produce the 3500 names which had been requested of them; as a result of the list's reworking, the commissioners somehow ended up with a list of 4015 names. Not a single commissioner was able to definitively describe the selection procedure which was employed in selecting the second group of names. Such inability to account for the procedures used in selecting over one quarter of the jury pool certainly causes us to question the state's asserted "random" methods.

A jury selection procedure that is as easily capable of being manipulated as the Troup County process goes far in supporting the presumption of discrimination urged by the petitioner based upon the 18.1% and 18.4% disparities demonstrated. In our opinion, petitioner has proved that these variances, in light of the highly subjective selection procedures utilized in the 1975 jury selection process, are unconstitutional absent a showing by the state that "racially neutral selection procedures have produced the monochromatic result." *Alexander v. Louisiana*, 405 U.S. at 632, 92 S.Ct. at 1226.

In rebuttal to the prima facie case, the state offered only the testimony of the jury commissioners that they had not discriminated on the basis of race or sex. However, the Supreme Court has repeatedly declared that such affirmations of good faith are "insufficient to overcome the prima facie case." *Whitus v. Georgia*, 385 U.S. 545, 551, 87 S.Ct. 643, 647, 17 L.Ed.2d 599 (1967); *Alexander v. Louisiana, supra,* 405 U.S. at 632, 92 S.Ct. at 1226; *Turner v. Fouche, supra,* 396 U.S. at 361, 90 S.Ct. at 540; *Norris v. Alabama,* 294 U.S. 587, 598, 55 S.Ct. 579, 583, 79 L.Ed. 1074 (1935).

Since petitioner has demonstrated that he was sentenced in 1977 before an unconstitutionally composed jury, we must grant re-

---

sure to get a cross-section. But it looked like that was not going to be enough so I went back and just checked some more.

Q. All right. How did you get those others that you checked?

A. I had no particular plan.

Q. You just got people that you knew?

A. I got as many as I needed.

Q. Explain that, if you would.

A. Well, you know, it's hard to tell you how a woman checks a list.

Q. A person checks a list, you mean? A woman is no different than any other person as far as checking the list.

A. I'm speaking for myself.

Q. All right. Well, there's no pattern of checking every sixth name on the list, is there?

A. No.

Q. I mean, I notice that the first is checked, the next four are checked, then I notice on this side there's five in a row checked. Then I notice there are four in a row checked and then I notice in the center column there's four checked in a row. One skipped, two checked. And then I notice that there are sixteen skipped in the middle row.

A. Well, I had no particular plan.

Q. And so then it wasn't just a matter of checking every sixth name and putting it on the jury list as far as West Point is concerned?

A. Well, I checked until I got enough names.

Q. All right. But you didn't check in any type of pattern though?

A. Not particularly; no.

R.Vol. 5 at 33–35.

**14.** *See, e.g.,* Morgan's testimony on cross-examination:

Q. And a lot of the people you had on there, you really weren't too sure whether they were black or white?

A. Right.

Q. Did you ever not let anybody serve on the jury because that person happened to be black?

A. No. On the contrary, occasionally when I recognized a name and I knew that person to be black, and sometimes a black woman, I purposely checked that name.

R.Vol. 5 at 40.

The state argues that such testimony demonstrates the lack of discriminatory intent on the part of the jury commissioners; on the contrary, such acknowledged familiarity with the sexual and racial characteristics of the voter's list is precisely the type of knowledge which renders the selection process subject to abuse.

lief and remand this case for yet another sentencing trial.

## II. THE WITHERSPOON CLAIM

During jury selection for Davis' 1977 resentencing trial, the trial court excused venirepersons Ruben Haynes, Theotis Davenport and Willie Cooper because they expressed opposition to the death penalty. Davis argues that their dismissal was unconstitutional under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Although the *Witherspoon* issue as it relates to the venirepersons at issue here is not dispositive of this appeal inasmuch as the jury composition challenge has been found to warrant a new sentencing trial for Davis, the issue is a serious one which merits some discussion.

In *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court recently reaffirmed that exclusion of a venireperson because of his opposition to the death penalty is permitted only if the venireperson clearly indicates that he would always vote against the death penalty or that his opposition to the death penalty would impair his ability to discharge his duties as a juror:

> [N]othing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to

any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

*Id.* at 44, 100 S.Ct. at 2526 (quoting *Witherspoon,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21) (emphasis in original).

We conclude that the record supports the trial court's determination that those jurors who were excused for cause had a state of mind such that they could not vote for the death penalty regardless of any evidence which might have been presented at trial and regardless of the law.

Davis contends that the responses of Haynes, Davenport and Cooper did not demonstrate either that they would automatically vote against the death penalty or that their opposition to the death penalty would affect their ability to make an impartial decision as to guilt. Relying on *Granviel v. Estelle,* 655 F.2d 673, 677 (5th Cir. 1981), *cert. denied,* 455 U.S. 1003, 1007, 102 S.Ct. 1636, 1644, 71 L.Ed.2d 870, 875 (1982), Davis argues that the responses of the venirepersons fell short of the unequivocal statement of opposition necessary to permit exclusion.

During the examination of venireperson Haynes, Haynes stated several times that he could not and would not vote for imposition of the death penalty regardless of the circumstances.[15] Although several of

---

15. The entire colloquy between venireperson Haynes and petitioner's attorney is as follows:

Q. Mr. Haynes, I ask you this question: Are you *conscientiously opposed* to capital punishment?

A. Am I opposed to it?

Q. Yes.

A. Well, I see it like this: I feel like if you kill a person, it's not going to bring a person back to life. I think if a person is going to do something like that, he should work and his labor be furnished to the State and the person go to a farm.

Q. Yes, sir. I understand that. So, do you believe in capital punishment?

A. No.

Q. You are opposed to capital punishment?

A. Yes.

Q. All right. Now, I'm going to ask you this question: Would your attitude towards capital punishment cause you to automatically vote against imposing the death penalty without regard to what evidence might be developed in the trial?

A. State that again.

Q. Would your attitude towards capital punishment that you have cause you to automatically vote against imposing the death penalty without any regard to the evidence that might be developed in the case in the trial, in the case before you?

A. No.

Q. Would you be willing to impose capital punishment if you thought the evidence justified it?

Haynes' statements by themselves do not suggest a clear and unambiguous statement of opposition, it is evident that Haynes' numerous affirmations of objection to the death penalty remove any ambiguity which may have existed. By indicating that his reservations about the death penalty were such that he would "automatically vote against imposing [it] without regard to what evidence might be developed in the trial," Haynes clearly met the standards for exclusion enunciated in *Witherspoon*. *See Witherspoon*, 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21. The responses of Davenport

A. Well, like I said, you know, it's not going to bring the person back.

Q. We're all aware of that, sir. My question is would you be willing to impose capital punishment if you thought the evidence justified it?

A. Well, taking the person's life isn't going to bring the person back.

    *    *    *    *    *    *

Q. My question to you is: Could you give a person capital punishment under any circumstances?

A. Well, I guess, it depends on the circumstances I guess. That would have something to do with it.

Q. Yes, sir. Could you under certain circumstances give somebody capital punishment?

A. Well, I'd have to do some thinking on that.

Q. Pardon?

A. Well, I'd have to look into it and think about it really.

    *    *    *    *    *    *

Q. All right, sir. What I want to know is is this feeling that you have about capital punishment so strong that you never would given it to anybody no matter what the evidence was?

A. The way I feel about it, I wouldn't. Like I said, it's not going to bring that person back. That's what I'm saying sir.

Q. So, you're saying that you would not give anybody capital punishment?

A. Sir, it would depend on the circumstances.

MR. KENDALL: Your Honor, I think that this juror has answered Mr. Lee's questions by saying that it would depend on the circumstances; and I think that again he is exactly the kind of juror we're willing to take.

THE COURT: I agree with you, but I think we're entitled to an answer. I don't think we've gotten a full answer. I agree with you, but I think we're entitled to a full answer.

BY MR. LEE:

Q. Tell me.

A. Okay. I would not give it to anybody.

Q. You would not give it to anybody?

A. That's right.

Q. Under any conditions?

A. No. That's not going to bring that person back.

MR. LEE: I think by his own statement he's explained his answer to the question. I think he can be excused for cause, Your Honor.

MR. KENDALL: Your Honor, may I examine?

THE COURT: Yes.

BY MR. KENDALL:

Q. Mr. Haynes, I'm not trying to put words in your mouth at all. This is as you probably know a proceeding simply to decide sentence in this case; in other words to choose between a sentence of life imprisonment and the death penalty for murder. Now, you haven't of course heard the evidence in this case; and I'm not asking you to make a judgment on evidence that you haven't heard. The question I would like to hear from you on is whether your mind is so closed against the death penalty that you would be unable to listen fairly to the evidence and the instructions of the trial court and consider the evidence in this case and consider those instructions and consider the possibility of imposing the death penalty?

A. Well, sir, it's like this. I don't know anything about this man. I don't know whether the man is guilty or not guilty. I haven't made no decision about it.

Q. Considering that you have not heard the evidence in this case, are you able to say unequivocally that you would automatically vote against the death penalty no matter what that evidence showed?

A. Well, I mean it would be different. Like I said, if you've got concrete evidence, it's a different story, you know.

Q. Excuse me, sir, if I may interrupt again. The evidence of guilt or innocence is not going to be a factor in this case. The evidence may come in, but that won't be the issue that you're going to decide. The question is simply whether you could consider after hearing the evidence the death penalty.

A. Would I consider it?

Q. Whether you could consider it as punishment?

A. Now if I wasn't sure, I couldn't consider it.

MR. KENDALL: Your Honor, we submit that this juror is qualified.

THE COURT: Excused for cause. You may get out.

R.Vol. 11 at 25-31.

and Cooper to the same line of questioning are clear and unambiguous statements of opposition to the death penalty.[16]

## III. THE SANDSTROM CLAIM

During the 1974 culpability phase of Davis' trial, the trial court charged in its instructions to the jury, that "it is true that the law presumes malice when a homicide has been shown, yet that presumption of malice may be rebutted by the defendant from evidence offered by him or from evidence offered by the state or from both."[17] Davis contends that this instruction violated his rights under *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and that this violation requires reversal of his conviction.

In *Sandstrom,* the Supreme Court found the language "the law presumes . . .," when used in reference to an essential element of a crime, susceptible of interpretation as creating a mandatory presumption and therefore unconstitutional absent neutralizing instructions. *Sandstrom v. Montana,* 442 U.S. at 515, 99 S.Ct. at 2454. This Court has likewise found a charge which stated that "the law presumes that every homicide is malicious until the contrary appears from circumstances of alleviation, excuse or justification," coupled with "it is incumbent upon the accused to make out such circumstances to your satisfaction unless they appear from the evidence produced against him . . ." to be unconstitutional when accompanied solely by the standard charge on burden of proof in a criminal case. *Lamb v. Jernigan,* 683 F.2d 1332, 1341 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983). The court in *Lamb* was concerned that the above instruction, standing alone, could have been read as shifting the burden of proof to the defendant on malice.

We find that the curative language ". . . or from evidence offered by the state or from both" which was present in the instructions given to the jurors in Davis' trial but absent from those read in *Sandstrom* and *Lamb,*[18] removes any possibility that the instruction may reasonably be interpreted as shifting the burden on malice. This Court has held that a malice charge containing the very similar curative language "but this presumption may be rebutted" is not unconstitutionally burden-shifting as such cautionary language refutes any claim that an irrebuttable presumption weighs against the defendant. *See Corn v. Zant,* 708 F.2d 549 (11th Cir.1983). The instructions in Davis' trial, combined with the general instructions that a defendant is presumed innocent until proven guilty and that the state has the burden of proving beyond a reasonable doubt all elements of the offense, therefore pass muster under the standards of *Sandstrom.*

## IV. APPLICATION OF AGGRAVATING CIRCUMSTANCE "OUTRAGEOUSLY OR WANTONLY VILE, HORRIBLE OR INHUMAN"

Petitioner contends that his sentence of death was based at least in part upon a jury finding of the aggravating circumstance defined in Ga.Code Ann. § 27–2534.-1(b)(7).[19] This statutory section permits a judge to include in his instructions for the jury to consider in their sentencing deliberations the fact that an offense of murder, rape, armed robbery or kidnapping was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim."[20] Petitioner further argues that his death sentence should be overturned

---

**16.** *See* R.Vol. 11 at 45–46; Vol. 8 at 99–100.

**17.** R.Vol. 1 at 207–10.

**18.** The Supreme Court specifically noted that the jurors in *Sandstrom* "were not told that the presumption could be rebutted . . . by the defendant's simple presentation of 'some' evidence; nor even that it could be rebutted at all." 442 U.S. at 517, 99 S.Ct. at 2455, 61 L.Ed.2d at 46.

**19.** The language of this section has been renumbered as § 17–10–30(b)(7) (1982) in the current Georgia Code.

**20.** A death sentence may not be imposed absent the finding, beyond a reasonable doubt, of a statutory aggravating circumstance. Ga. Code Ann. § 27–2534.1(c) [Ga.Code Ann. § 17–10–30(c) (1982) ].

because the section was applied unconstitutionally at his resentencing trial. In support of this argument, petitioner maintains that the code section was read to the jury without explanatory instructions, which are mandated by the Supreme Court decision in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

This issue is moot insofar as petitioner will be retried on the issue of sentencing. However, we note that notwithstanding the merits of petitioner's claim as to the unconstitutionality of this section as applied, this claim is controlled by the Supreme Court's recent decision in *Barclay v. Florida,* —— U.S. ——, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983). A plurality of the court in *Barclay* held that where several aggravating factors are considered in arriving at a sentencing determination and one of those factors is improper, the improper factor is likely to be harmless error in instances where no mitigating factors are shown. In evaluating state court review of a sentencing procedure in which just such a circumstance obtained, the Court said that "[t]here is no reason why the Florida Supreme Court cannot examine the balance struck by the trial judge and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance." *Barclay, supra,* 103 S.Ct. at 3428. At petitioner's resentencing trial, the jury found a second aggravating circumstance in the form of prior felony convictions and no mitigating circumstances were found in his favor. Under such circumstances, even a finding that one jury instruction was unconstitutionally applied would likely not entitle petitioner to a new sentencing hearing. It would be a factor to be duly considered by the Supreme Court of Georgia. We assume, however, that correct instructions will be given in the retrial.

## V. EFFECTIVE ASSISTANCE OF COUNSEL

■ Petitioner contends that he was denied the effective assistance of counsel at the culpability phase of his trial. Petitioner presented these same claims of ineffective-

ness to the state court in his state habeas corpus proceeding. The state trial judge held a hearing and found that petitioner was represented by reasonably competent and effective counsel.

The district court also carefully considered petitioner's claims of ineffective assistance of counsel and denied relief. The court set out and considered each of the specific allegations of ineffectiveness made by petitioner with respect to his counsel during the culpability trial, most of which had been presented in the state habeas proceeding:

(a) permitting the police to interrogate petitioner outside the presence of counsel;

(b) failure to conduct an independent investigation, interview witnesses, or to present evidence in petitioner's behalf;

(c) failure to adequately consult with petitioner;

(d) failure to file pretrial motions;

(e) failure to conduct an adequate voir dire of jurors;

(f) failure to file a motion for change of venue despite adverse pretrial publicity;

(g) failure to file a motion for funds for expert witnesses;

(h) failure to file a motion to suppress a .22 caliber pistol;

(i) failure to move to suppress statements made by petitioner to the police, although such statements were the result of an illegal arrest and interrogation without counsel's presence; and

(j) failure to challenge the grand and traverse jury pools in Troup County.

The court then independently reviewed the grounds alleged by the petitioner and made the following extensive findings:

(1) counsel conducted his own investigation;

(2) he also interviewed some witnesses, and attempted to interview others;

(3) petitioner has not suggested nor is it apparent to the court what evidence in his behalf should have been presented but was not;

(4) counsel consulted with petitioner on a significant number of occasions;

(5) counsel conducted an adequate voir dire examination of jurors;

(6) counsel's decision not to file a motion for change of venue was at the behest of petitioner;

(7) the evidence showed that the search and seizure of the pistol was consented to, justifying counsel's determination that a motion to suppress would have been fruitless;

(8) counsel made a reasonable decision that expert witnesses were not called for;

(9) inasmuch as it is permissible for a defendant to make in-custody statements to the authorities outside the presence of counsel where there is a voluntary relinquishment by the defendant of the right to have counsel present, *see Government of Canal Zone v. Sierra,* 594 F.2d 60 (5th Cir.1979), petitioner's allegation that his attorney was ineffective for allowing questioning in his absence is without merit, since the record shows the existence of a voluntary waiver by petitioner on each of the occasions that a statement was made;

(10) there is also no basis in the record for petitioner's assertion that the statements resulted from an illegal arrest; counsel was therefore not ineffective for failing to move to suppress such statements;

(11) petitioner's claim that counsel should have filed other, unspecified pretrial motions is without merit; and

(12) assuming without deciding that a successful jury composition challenge might have been brought, a finding of lack of effective assistance of counsel on this ground either alone or in conjunction with any other ground is unsupported by the evidence.

Based upon these findings and considering the totality of circumstances in the record, *Washington v. Estelle,* 648 F.2d 276, 279 (5th Cir.1981), the court concluded that petitioner's 1974 trial counsel met the con-

stitutional standard for effective assistance of counsel in that he was not errorless but was "reasonably likely to render *and rendering* reasonably effective assistance." *See MacKenna v. Ellis,* 280 F.2d 592, 599 (5th Cir.1960) (emphasis in original), *adhered to in pertinent part on rehearing en banc,* 289 F.2d 928, *cert. denied,* 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961).[21] After a review of the district court's findings and the record on appeal, we must agree with the district court and reject petitioner's claims concerning counsel at his original trial.

## VI. PETITIONER'S STATEMENTS TO POLICE DURING IN-CUSTODY INTERROGATION

■ Petitioner contends that inculpatory statements made by him to police during in-custody investigations were unconstitutionally obtained and later introduced against him at both the culpability phase and the resentencing phase of the trial.

Davis was arrested in July 1974 and for the next month was interrogated frequently in the county jail by police; Davis' counsel was not present at the interrogations. During the questioning by police, Davis made statements which increasingly linked him to the commission of the murder for which he was charged. Ultimately, in late August 1974, he led police to the location of the victim's body.[22] Davis contends that the in-custody interrogation was unconstitutional in that he did not make a proper waiver of the right to silence and the right to counsel. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The record, however, demonstrates that petitioner was afforded a full and fair hearing on this issue in the district court. The district court concluded that each time Davis made a statement to the police, he voluntarily waived his right to remain silent and his right to counsel. This Court has long recognized that it is not unusual for an

---

**21.** *See* R.Vol. 1 at 207–10.

**22.** R.Vol. 2 at 70–72.

arrested person to voluntarily cooperate with law enforcement officials. Such cooperation may be prompted by a desire for leniency for himself or others; it may also represent a person's attempt to assuage feelings of guilt or remorse which resulted from his prior actions. *See, e.g., United States v. Robertson,* 582 F.2d 1356, 1368 (5th Cir.1978). The district court also noted that it is permissible for a defendant to make in-custody statements to law enforcement officials outside the presence of counsel, where there has been a voluntary relinquishment by a defendant of his right to have his counsel present. *See Government of Canal Zone v. Sierra,* 594 F.2d 60 (5th Cir.1980). Furthermore, our independent examination of the record leads us to the conclusion that there is ample evidence to support the district court's findings that such conversations were initiated by the petitioner and that petitioner voluntarily waived his right to silence and his right to counsel prior to each discussion.

## VII. THE PROSECUTOR'S CLOSING ARGUMENT

As we must grant relief and remand these proceedings for another sentencing trial, the specific contentions of Davis as to the impropriety of the prosecutor's statements during closing argument at petitioner's 1977 resentencing trial are moot and need not be addressed in detail here. However, as guidance with regard to permissible and impermissible prosecutorial conduct, we suggest that prosecutors read the recent decisions of this Court, including but not limited to, *Hance v. Zant,* 696 F.2d 940, 951–52 (11th Cir.1983) and *Brooks v. Francis,* 716 F.2d 780, at 787–788 (11th Cir.1983).

## VIII. USE OF PETITIONER'S PRIOR CONVICTIONS

■ Petitioner asserts that his numerous prior felony convictions obtained in Georgia county courts were improperly introduced against him as aggravating circumstances during his 1977 resentencing trial. A reading of the record quickly dem-

onstrates that such contentions are wholly without merit.

Specifically, petitioner claims that the prior convictions were inadmissible in that they were entered into without the assistance of counsel. The district court considered this allegation and correctly concluded that such a claim hardly deserves attention, for petitioner, though given ample opportunity at the state court level, failed to produce one shred of evidence in support of his claim. Petitioner's claims that the introduction of the noncapital convictions and the length of the sentences were improper under Georgia law were likewise properly rejected by the district court, for the introduction of these factors into evidence in sentencing trials has been specifically approved by the Georgia Supreme Court. *See Davis v. State,* 241 Ga. at 383–84, 247 S.E.2d at 52–53 (1978).

## IX. PROCEEDING TO DISQUALIFY THE TRIAL JUDGE

■ Petitioner alleges that the proceeding to determine whether the 1977 sentencing trial judge should have been disqualified was improper and that the presiding judge at the sentencing trial was biased against the petitioner. However, the district court is correct in noting that such allegations were not substantiated at either the state court or at the federal district court level.[23] Such general allegations can hardly support the granting of federal habeas corpus relief.

## CONCLUSION

Finding that petitioner was sentenced in 1977 before an unconstitutionally composed jury, the district court's dismissal of the petition for writ of habeas corpus is REVERSED and this claim is REMANDED for the granting of appropriate relief. Petitioner is entitled to a new sentencing proceeding before a jury properly empaneled.

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion except as to Part III. I respectfully dissent from

---

**23.** *See* R.Vol. 1 at 214.

Part III, for I conclude that the trial court's instruction on malice unconstitutionally shifted the burden of proof to petitioner.

In determining whether a particular jury instruction shifted the burden of proof to the defendant, an appellate court must examine "the words actually spoken to the jury" to determine "the way in which a reasonable jury could have interpreted the instruction." *Sandstrom v. Montana,* 442 U.S. 510, 514, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979). Thus where a reasonable juror could have read the charge as creating a mandatory presumption and could have given the presumption conclusive or persuasion-shifting effect, the court must proceed on the assumption that the appellant's jurors did just that. *Id.* at 519, 99 S.Ct. at 2456.

The first question in this case, then, is whether the trial court's malice instruction could have been interpreted by a reasonable juror as shifting the burden of proof to petitioner. Our decision in *Lamb v. Jernigan,* 683 F.2d 1332 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983), answers this question. There the trial court's charge stated that "the law presumes that every homicide is malicious until the contrary appears from circumstances of alleviation, excuse or justification, and it is incumbant [sic] upon the accused to make out such circumstances to your satisfaction unless they appear from the evidence produced against him." The language at issue here is almost identical: "[t]he law presumes it to be malice until the contrary appears from circumstances of alleviation or excuse, or justification and under the laws, it is incumbent upon the Defendant to make out such circumstances satisfactory to the Jury unless they appear from the evidence offered against the Defendant." As in *Lamb,* I "cannot escape the conclusion that the above instruction, by itself, could have been read as shifting the burden of proof to the defendant on an essential element of the crime of murder." *Id.* at 1341.

I disagree with the majority's assertion that the potential for a burden-shifting in-

terpretation was neutralized by the trial court's subsequent instruction that "while it is true that the law presumes malice when a homicide has been shown, yet that presumption of malice may be rebutted by the Defendant from evidence offered by him, or from evidence offered by the State, or from both." This statement by no means eliminated the danger of an impermissible interpretation; rather, in reiterating that the defendant had to meet the burden of disproving malice by rebutting the presumption thereof, it exacerbated the problem identified in *Lamb.* The "curative" language "or from evidence offered by the State, or from both" merely indicated that the defendant could point to evidence adduced by the state in meeting his burden, that is, he did not have to introduce evidence of his own. In any case, the defendant still bore the risk of non-persuasion.

In my judgment, neither the language relied upon by the majority, nor the other instructions at trial distinguish this case from *Lamb* and "rule out the substantial possibility that the jury interpreted the charge as relieving the state of its constitutional burden of proving malice beyond a reasonable doubt. 'Accordingly, [petitioner's] conviction and sentence must be set aside unless the erroneous charge was harmless beyond a reasonable doubt.'" *Lamb,* 683 F.2d at 1341 (quoting *Mason v. Balkcom,* 669 F.2d 222, 226 (5th Cir.1982)). Insofar as petitioner was tried on a theory of malice murder, not felony murder, the issue of malice was critical to the jury's determination of guilt. Given that the evidence of petitioner's participation in the actual killing—primarily his statements admitting presence, with others, when the killing occurred—was not overwhelming, I conclude that the instruction in question was not harmless beyond a reasonable doubt. *See Connecticut v. Johnson,* —— U.S. ——, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983). For these reasons, I would vacate petitioner's conviction and sentence.