**Charlie Benson BOWEN,**
**Petitioner-Appellee,**

v.

**Ralph KEMP, Warden, Georgia Diagnostic and Classification Center,**
**Respondent-Appellant.**

No. 84–8327.

United States Court of Appeals,
Eleventh Circuit.

Aug. 6, 1985.

Johnson, Circuit Judge, specially concurred in part, dissented in part, and filed an opinion.

George C. Young, District Judge, sitting by designation, concurred in part, dissented in part, and filed an opinion.

Susan V. Boleyn, Asst. Atty. Gen., and William B. Hill, Jr., Atlanta, Ga., for respondent-appellant.

Paul H. Kehir, Atlanta, Ga. (Court-appointed), for petitioner-appellee.

Before FAY and JOHNSON, Circuit Judges, and YOUNG *, District Judge.

FAY, Circuit Judge:

Petitioner, Charlie Benson Bowen, was convicted by a jury in Polk County, Georgia, of rape and murder. He was sentenced to life imprisonment for the rape charge and to death for the murder charge. Having exhausted his state court remedies, Bowen filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent, Ralph Kemp, Warden, Georgia Diagnostic and Treatment Center, appeals the district court's grant of the writ.

Respondent raises three issues on appeal: (1) whether the district court erred in holding that the state trial court's charge to the jury during Bowen's culpability trial improperly shifted the burden of proof on the element of intent, in violation of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and was not harmless beyond a reasonable doubt; (2) whether the district court erred in holding

---

* Honorable George C. Young, U.S. District Judge for the Middle District of Florida, sitting by designation.

that the prosecutor's closing argument during the sentencing phase of Bowen's trial rendered that phase fundamentally unfair; and (3) whether the district court erred in finding that Bowen was entitled to a new sentencing trial since the sentencing jury was drawn from an unconstitutionally composed traverse jury list. We affirm the district court's jury composition ruling and reverse the district court's rulings on the *Sandstrom* and prosecutorial argument issues.

## I. PROCEDURAL HISTORY

Bowen was indicted in Polk County, Georgia, on charges of raping and murdering a twelve-year old girl.[1] The trial jury found him guilty on both counts, and, pursuant to Georgia's bifurcated trial procedure, a jury thereafter sentenced him to life imprisonment for rape and to death for murder. On direct appeal, the Georgia Supreme Court affirmed the underlying convictions and rape sentence. The death sentence, however, was set aside and the case was remanded solely for resentencing on the murder conviction. *Bowen v. State,* 241 Ga. 492, 246 S.E.2d 322 (1978).

In September of 1978, a Polk County jury again sentenced Bowen to death. The Georgia Supreme Court affirmed, *Bowen v. State,* 244 Ga. 495, 260 S.E.2d 855 (1979), and the United States Supreme Court denied certiorari. *Bowen v. Georgia,* 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831 (1980).

Bowen then filed a petition for a writ of habeas corpus in the Superior Court of Butts County. The writ was denied, as was his application to the Georgia Supreme Court for a certificate of probable cause to appeal that denial. The United States Supreme Court again denied certiorari. *Bowen v. Zant,* 455 U.S. 983, 102 S.Ct. 1491, 71 L.Ed.2d 692 (1982).

Bowen thereafter sought habeas relief in the United States District Court for the Northern District of Georgia. An evidentiary hearing was held before the United States Magistrate, who recommended that relief be limited to granting Bowen a new sentencing trial on the murder conviction. The district court agreed on this point, but went further; it also held that (1) the jury charge given during the guilt phase of Bowen's trial impermissibly shifted the burden of proving intent, in violation of *Sandstrom,* and that this error was not harmless beyond a reasonable doubt, and (2) the prosecutor's closing arguments during the sentencing hearing rendered that phase of Bowen's trial fundamentally unfair.

## II(a) THE SANDSTROM ISSUE

Bowen asserts that the following jury instruction impermissibly shifted the burden of proof on the element of intent, in violation of *Sandstrom:*

> The acts of a person of sound mind and discretion are presumed to be the product of the person's will but the presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his act but the presumption may be rebutted. A person will not be presumed to act with criminal intention but the tryor [sic] of facts, that is you the jury, may find such intention upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted.

We agree.

■ The Supreme Court, in *Franklin v. Francis,* —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), held that a portion of a jury charge virtually identical to the one at issue here "undeniably created an unconstitutional burden-shifting presumption with respect to the element of intent." *Id.* at ——, 105 S.Ct. at 1973. The Court also rejected the state's argument, identical to the one advanced by respondent in the in-

---

1. For a detailed discussion of the historical facts in this case, see *Bowen v. State,* 241 Ga. 492, 246 S.E.2d 322 (1978).

stant case, that any technical infirmity in the challenged instruction was sufficiently cured by clarifying language found elsewhere in the charge. *Id.* at —— – ——, 105 S.Ct. at 1972–77. "[B]ecause the charge read as a whole does not explain or cure the error, we hold that the jury charge does not comport with the requirements of the Due Process Clause." *Id.*, at ——, 105 S.Ct. at 1977. The district court did not err in finding that the instruction violated *Sandstrom.*

## II(b) HARMLESS ERROR

The Supreme Court has not yet determined "whether an erroneous charge that shifts a burden of persuasion on essential element of an offense can ever be harmless." *Id.* We recognize, however, that four members of the Supreme Court have suggested that a jury instruction violating *Sandstrom* cannot be considered harmless error except in "rare situations." *Connecticut v. Johnson,* 460 U.S. 73, 87, 103 S.Ct. 969, 977, 74 L.Ed.2d 823 (1983) (plurality opinion). Since this position has yet to command a majority of the Court, we continue to apply the harmless error analysis in the *Sandstrom* context, as we do with most other errors of constitutional significance. *See Tucker v. Francis,* 762 F.2d 1496, 1501 (11th Cir.1985) (en banc); *Davis v. Kemp,* 752 F.2d 1515, 1521 (11th Cir.1985) (en banc).

The *Davis* Court fleshed out the contours of the harmless error inquiry as it relates to a *Sandstrom* violation. *Davis* recognized that this circuit has identified two situations where the harmless error rule can be invoked. Harmless error analysis is proper "if the evidence was overwhelming as to the defendant's guilt and if the instruction was applied to an element of the crime which was not at issue at the trial." *Id; accord, Tucker,* 762 F.2d 1502; *Brooks v. Francis,* 762 F.2d 1383, 1390 (11th Cir. 1985) (en banc). *Davis* further states that with respect to the first situation, the court's analysis should "focus on whether evidence of *intent,* rather than the more inclusive issue of *guilt,* is overwhelming."

*Tucker,* 762 F.2d 1502 (emphasis in original) (citing *Davis,* 752 F.2d at 1521 & n. 10). In this regard, the nature of the defense asserted at trial may be an important factor. *See Brooks,* 762 F.2d 1390.

A reading of *Davis* and its progeny reveals that when a court focuses on the degree of evidence of intent, it should examine the evidence without reference to the particular defendant. In other words, the court should examine the evidence as if the allegedly criminal conduct had been performed by some anonymous actor. For example, in *Davis,* where the defense essentially was non-involvement, the Court examined the circumstances of the victim's death and concluded "that whoever killed the victim did so with intent and malice." *Davis,* 752 F.2d at 1521. In *Tucker,* another non-involvement defense case, the Court reasoned that the evidence was overwhelming that whoever killed the victim did so intentionally because "the victim died of one crushing blow to the skull by a blunt instrument." *Tucker,* 762 F.2d 1503. A similar tack was taken in *Brooks,* a case in which the defendant asserted accident as his defense. In holding the *Sandstrom* violation to be not harmless beyond a reasonable doubt, the *Brooks* Court emphasized that the evidence of intent was not overwhelming because of the manner in which the victim was killed. *Brooks,* 762 F.2d 1391–93 & n. 14.

Using this approach, we conclude that the evidence of intent to kill Sheila Denise Young, the victim in this case, was overwhelming. The child's nude body was found beside a bloodied mattress in a vacant house. She had been stabbed fourteen times about the face, chest, and abdomen, and died because of loss of blood. Her death obviously was not the result of accident, mistake, or negligence, but rather was the result of an "intentional" act.

Moreover, Bowen, in a very real sense, conceded the issue of intent. In discussing those "rare situations" where the *Connecticut v. Johnson* plurality might employ the harmless error rule, Justice Blackmun stated:

[A] *Sandstrom* error may be harmless if the defendant conceded the issue of intent. See, *e.g., Krzeminski v. Perini,* 614 F.2d 121, 125 [6th Cir.], cert. denied, 449 U.S. 866 [101 S.Ct. 199, 66 L.Ed.2d 84] (1980). See also *Washington v. Harris,* 650 F.2d 447, 453–54 [2d Cir.1981], cert. denied, 455 U.S. 951 [102 S.Ct. 1455, 71 L.Ed.2d 666] (1982). *In presenting a defense such as* alibi, *insanity,* or self-defense, *a defendant may* in some cases *admit that the act alleged by the prosecution was intentional,* thereby sufficiently reducing the likelihood that the jury applied the erroneous instruction as to permit the appellate court to consider the error harmless.

*Connecticut v. Johnson,* 460 U.S. at 87, 103 S.Ct. at 978 (emphasis added). Bowen's sole defense at trial was insanity; he never denied that he repeatedly stabbed Sheila Denise Young. By relying exclusively on an unsound mind defense, Bowen effectively conceded that if his defense were not accepted, it could not be gainsaid that his acts were anything but intentional.

The instant case is readily distinguishable from *Engle v. Koehler,* 707 F.2d 241 (6th Cir.1983), *aff'd by an equally divided Court,* —— U.S. ——, 104 S.Ct. 1673, 80 L.Ed.2d 1 (1984) (per curiam), a factually similar case relied upon by the en banc Court in *Davis.* The defendant in *Koehler* was convicted of first degree murder. His "sole defense was temporary insanity because of the effects of alcohol, drugs and dissociative reaction." *Koehler,* 707 F.2d at 243. The Sixth Circuit found that a *Sandstrom* burden-shifting instruction was not harmless error beyond a reasonable

doubt, and therefore granted habeas relief. *Id.* at 246. The court reasoned that the *Sandstrom* violation was not harmless because the evidence concerning the defendant's lack of *mens rea* defense was conflicting. *Id.*

The similarity between the instant case and *Koehler* ends, however, with the *Sandstrom* violations and the defenses asserted. The instruction condemned in *Koehler* stated that *"the law gives us a rule of thumb that a person is presumed to intend the natural consequences of his acts." Id.* at 243 (emphasis in original). The clear import of this instruction is that the presumption applies to *all* persons, whether sane or not. In the instant case, however, the offensive presumption would not become operative unless and until the jury found that Bowen was "a person of *sound mind* and discretion." In other words, if the jury accepted Bowen's insanity defense, and he thus was considered a person of unsound mind, the jury could *not* presume that he intended the natural and probable consequences of his acts.[2] But the jury did not accept Bowen's defense. Consequently, the jury conceivably could have relied on the "mandatory rebuttable presumption." By that point, however, Bowen's sole defense already had fallen by the wayside, and intent no longer was a viable issue in the trial.

*Franklin v. Francis,* 720 F.2d 1206 (11th Cir.1983), *aff'd,* —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), is instructive by way of comparison. In *Franklin,* the court found that an instruction identical in all material respects to the one at issue

---

**2.** Apart from the language of the challenged instruction, other instructions in the trial court's charge make it clear that acceptance of Bowen's insanity defense would preclude resort to the offensive presumption. After instructing the jury on Bowen's insanity defense (Bowen does not challenge these instructions and we therefore assume they were proper), the court stated:
 > [I]f you find that the defendant did not have reason sufficient to distinguish between right and wrong, as I have instructed you, at the time of the commission of the alleged offense ..., that *would be an end to your consideration of the case and you would stop at that*

*point* and enter a verdict that would reflect that finding.

Tr. at 463 (emphasis added).

In the next paragraph of its charge, the court instructed the jury:
 > If, however, from a consideration of the evidence *you determine that* at that time and place of the occasion under investigation in this trial that *the defendant was sane* and thus responsible in such event *you would proceed to consider the other portions of the charge that I have given you,* or am about to give you.

*Id.* (emphasis added).

here violated *Sandstrom*. The court held that the error was not harmless since the facts did not overwhelmingly preclude the defendant's accident defense. The court reasoned: "A presumption that Franklin intended to kill *completely eliminated his defense* of 'no intent.'" *Franklin*, 720 F.2d at 1212 (emphasis added).

The lesson of *Franklin* is clear: A *Sandstrom* violation will not be deemed harmless if the presumption works to deprive the defendant of an asserted defense that is plainly at issue. Here, unlike the situation in *Franklin*, the defendant's sole defense had been "completely eliminated" before the proscribed presumption could have become operative. *Cf. Connecticut v. Johnson*, 460 U.S. at 98 n. 6, 103 S.Ct. at 983 n. 6 (Powell, J., dissenting) ("The question of intent is one of fact and ... before a jury even reaches the presumption instruction it must find facts that are a predicate for the presumption.").

Based on the foregoing, we hold that it is beyond a reasonable doubt that the *Sandstrom* error in this case did not contribute to Bowen's murder conviction. The error was harmless and we therefore reverse the district court's holding to the contrary.

## III. PROSECUTORIAL ARGUMENT

Bowen challenges portions of the prosecutor's closing argument during the sentencing phase of his trial. Bowen argued in his petition filed in the district court that the following passage improperly raised the possibility that he might be paroled from a life sentence:

[The Prosecutor]: And now we come up here with this idea that here is a man that even though he knew that he himself ... even though he was convicted in his own heart and he desired to die and we are approached with the proposition

that he is subject to be rehabilitated and released back into society.

Yeah, I guess he can be rehabilitated. Hitler could have been. I believe in about six or eight months if I'd had him chained to a wall and talked to him and beat him on one side of the head for a while with a stick telling him you believe this don't you then beat him on the other side with a stick telling him you believe that don't you I believe I could have rehabilitated Hitler.

Yeah, it's conceivable that he could come back into society. It's conceivable that he can go back to work at Goodyear Mills in the twister room. Yeah, it's conceivable that he can go see Angie some more. Yeah, it's conceivable that he can be let out to gamble, it's conceivable that he can be let out to drink his beer and smoke his marijuana, and it's conceivable that he could pick up another little twelve year old girl, if you want him to all you've got to do is ...

[Defense Counsel]: I'm going to object to this line or [sic] argument. Your honor, I think this is going beyond the bounds of a fair argument and I suggest that he be directed to cease from that.

The Court: I overrule your objection.

[The Prosecutor]: They say he can come back into society. Some of them would welcome him with open arms but I'm not. They can call me what they wish, unchristian or whatever they want to. I'm not willing to. I'm willing to abide by your determination because it's a determination you must make.

Tr. at 576–77.

The district court, on the basis of this and other statements made by the prosecutor in his closing argument which will be discussed below,[3] held that Bowen's sen-

---

**3.** In his habeas petition, Bowen specifically contested only the prosecutorial argument quoted *supra* in the text. This also was the only argument objected to by trial counsel in the sentencing hearing. The district court, however, examined the challenged argument in light of the prosecutor's entire closing. In the court's view, the challenged argument, when considered with

other arguments the court found objectionable, rendered the sentencing hearing fundamentally unfair. Because the district court considered arguments which were not objected to at trial, and respondent does not contend here that that consideration was improper, we find it appropriate to address all the arguments the district court regarded as improper.

tencing trial was rendered fundamentally unfair. We disagree.

The law is clear that habeas relief will not be given for improper prosecutorial arguments unless those arguments rendered the sentencing proceeding "fundamentally unfair." *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974); *see Brooks*, 762 F.2d 1400; *Tucker*, 762 F.2d 1504; *Drake v. Francis*, 762 F.2d 1449, 1457–1458 (11th Cir.1985) (en banc). To make that determination, the reviewing court must decide whether there is a reasonable probability that, had the remarks not been made, the sentencing outcome would have been different. *Brooks*, 762 F.2d 1402 (citing *Strickland v. Washington*, 466 U.S. 668, ——, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984)).

As an initial matter, we interpret the content of the argument quoted above as more a comment on Bowen's future dangerousness and prospects for rehabilitation than an injection of the possibility of parole into the sentencing hearing. Throughout the sentencing hearing, defense counsel attempted to portray Bowen as a person who converted to Christ after his incarceration for killing Sheila Denise Young. For example, J.D. Bryant, a deputy sheriff with the Polk County Sheriff's Department, was called to testify on behalf of Bowen. Bryant worked at the jail where Bowen had been housed since his arrest. Bowen's counsel specifically asked Bryant if he had "any opinion regarding [Bowen's] potential for rehabilitation and return to society." Tr. at 278. Bryant, a Baptist minister, testified that in his opinion, Bowen truly had experienced a religious conversion and now was a "model individual" who "could participate in society and become a useful member of society." *Id.*

The en banc court has made it clear that consideration of future dangerousness "is a proper element in the sentencing jury's decision." *Brooks*, 762 F.2d 1412. "Similarly, ... the jury may appropriately consider whether [the] defendant is ... so unlikely to be rehabilitated that incapaci-

tation is warranted." *Id.* at 1407. The prosecutor therefore did not act improperly when he attempted to nullify Bowen's characterization of himself as a person who was fully rehabilitated as the result of a recent spiritual metamorphosis.

We nonetheless agree with the district court that the challenged argument improperly stated the prosecutor's personal opinion regarding Bowen's potential for rehabilitation. The Supreme Court, in a related context, recently stated:

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its view of the evidence.

*United States v. Young*, —— U.S. ——, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985). Additionally, "[a]n attorney's personal opinions are irrelevant to the sentencing jury's task." *Brooks*, 762 F.2d 1408.

It is clear that the Hitler analogy was an improper statement of the prosecutor's personal opinion regarding Bowen's rehabilitative potential. Similarly, the prosecutor's personal feelings concerning Bowen's possible return to society were irrelevant and improperly put before the sentencing jury.

The district court also condemned the following arguments made by the prosecutor: "If you [the jury] want him [to return to society as a rehabilitated man] fine, but I don't want him in my society;" Tr. at 564; "I wish [Bowen] had woke up dead." *Id.* at 575. Although these statements arguably advocate the appropriateness of retribution, a penological justification for the death penalty which is properly considered by the jury, *Brooks*, 762 F.2d 1406–1407,

the fact remains that they were couched in the form of personal opinions. These arguments therefore also were improper.

The district court took issue with the prosecutor's characterization of Bowen as "a product of the devil," Tr. at 565, "a liar," *id.* at 567, who was "no better than a beast." *Id.* at 569. We address these in turn.

■ With respect to the first of these remarks, we note that the prosecutor was not referring specifically to Bowen, but rather was commenting on the insanity defense in general. The prosecutor was simply making the point that not all perpetrators of heinous crimes are insane and that society has "gotten away from the old time idea that [a defendant can commit a vicious crime] because [the defendant is] a product of the devil, and [the defendant commits the crime] because [he does not] care." *Id.* at 565. Although dramatic, we do not view this argument as improper.

■ We also do not regard the prosecutor's statement that Bowen was a liar as improper. When the term was used, the prosecutor was arguing to the jury that Bowen did not act like a person who was disoriented and out of touch with reality when he killed Sheila Denise Young. The prosecutor argued that Bowen tried to cover up the fact that he had attacked his own daughter shortly before the crimes for which he was convicted. The prosecutor stated: "But he wanted to hide the fact it was him. If he was out of touch with reality what did it matter. He'd say why sure, I did that. No, he lied to his wife about it and he lied to everybody about it...." *Id.* at 567. The prosecutor's argument has ample support in the record and is not improper.

■ The reference to Bowen as "no better than a beast" was made as part of an argument that Bowen, who apparently attempted to commit suicide shortly after he attacked his daughter, himself believed that he should forfeit his life for attacking his own flesh and blood. This reference was supported by the evidence and was not

improper. *See Tucker*, 762 F.2d 1507 (description of defendant as "less than human" not improper where supported by the evidence).

■ The following argument also was censured by the district court: "We are living in the days of Cain and the voices heard are Abel's crying out to us all the time the voices of the murdered cry out.... To whom do they call? The can only call to the ministers of the law for recompense or vengence [sic].... As a juror, you are a minister of the law. The only place Sheila Denise Young has to appeal to is you." Tr. at 578–79. This argument was, in our view, not improper.

"It is completely appropriate to remind the jury of the importance of its sentencing decision." *Tucker*, 762 F.2d 1508. This is precisely what the prosecutor did here, albeit in rather colorful prose. He did not argue that any future victim of Bowen would be on the jury's conscience, nor did he state that the jurors were the only persons who could stop Bowen from killing again. *See id.* at 1508. Rather, the prosecutor was bringing home the point that the jurors were the only "ministers of the law" able to exact appropriate retribution from the slayer of Sheila Denise Young. This was proper argument. *Cf. Brooks*, 762 F.2d 1412 ("The reminder to the jury that 'the buck stops with you today' was an appropriate reference to the fact that the jury must make the ultimate decision.").

The final argument the district court relied upon to invalidate the sentencing hearing went as follows: "You know for a criminal to go without proper punishment is a disgrace to the society we live in and it's shown to us every day by the fruits that we reap from day to day in our society when we have the bloody deeds such as this occur." Tr. at 579. Standing alone, this passage does not appear to be an improper argument. When read in context, however, it is clear that the prosecutor was giving his watered-down rendition of an

argument found improper by the en banc Court in *Drake*, 762 F.2d 1449.[4]

Immediately before the challenged argument the prosecutor stated:

> You know *one of our noted justices* once said that the sickly sentimentality that causes us to shirk whenever the axe of justice is about to fall that it is not true sentimentality, that it cannot produce true justice, that it may be the sign of a tender heart but it is also a sign of one not under proper regulation.
>
> Now, society, *this is in the words of a justice*, demands that crime be punished for criminal deeds and false humanity starts and shudders when the axe of justice is ready to strike is a dangerous element to peace and society. *That's true today. Justice as it has been for years and years.*
>
> Now we've had too much of this and it's not true. We must insist on mercy for society and not always look to the criminal convicted of hideous, monstrous, vile, outrageous acts.

Tr. at 579 (emphasis added). Immediately after the challenged argument, the prosecutor stated:

> But do you know what it would take to stop it, a stern, unbending, unflinching administration of the law, stern punishment by people who stand for something,

are willing to stand up and fulfill the commands of the law.

*Id.* at 579–80.

In light of *Drake*, we conclude that this argument was improper. Although the prosecutor did not specifically invoke the Supreme Court of Georgia to abjure mercy, as was the case in *Drake*, he did attribute to a "justice" the view that opting for mercy was frowned upon. The argument was not as prejudicial as the one challenged in *Drake*, *see infra* note 5, yet nonetheless was improper.

We have identified two types of improper prosecutorial argument at Bowen's sentencing trial: (1) the prosecutor's statements of his personal opinions; and (2) the prosecutor's suggestion that a "noted justice" believed that mercy was an inappropriate consideration for Bowen. Because the improper arguments focused in the main on Bowen's rehabilitative prospects and the propriety of mercy, we conclude that they did not influence the jury's finding of aggravating circumstances. Indeed, Bowen does not even contend that the argument found improper by the district court affected the jury's finding that the murder was horrible or inhuman because it involved torture. *See* Ga.Code Ann. § 17–10–30(b)(7); Tr. at 613. Therefore, under

---

**4.** The *Drake* court found the following argument "extremely improper." *Drake*, 762 F.2d 1458:

> If your Honor please, in connection, in my urging you to submit this to the jury, the State of Georgia, the Supreme Court of Georgia in *Hawkins v. State*, in 25 Ga., page 207, the Court, in upholding the murder and the death sentence in that case said this: "Human life is sacrificed at this day throughout the land with more indifference than the life of a dog, especially if it be a good ·dog." They went on to hold that Cain was the first murderer, but who was the last is known only to those who have read this morning's papers. And they said, "If this crime goes unpunished, let our skirts at least be free from the stain of blood guiltiness."
>
> If your Honor please, in *Eberhart v. State*, 47 Ga. [598], page 610, the Justice of the Supreme Court of Georgia said this, in connection with the death sentence for murder: "We have, however, no sympathy with that sickly sentimentality that springs into action

whenever a criminal is at last about to suffer for a crime. It may be a sign of a tender heart, but it is also a sign of one not under proper regulation. Society demands that crime shall be punished, and criminals warned, and the false humanity that starts and shudders when the axe of justice is ready to strike is a dangerous element for the peace of society." The Court went on to say, "We have had too much of this mercy. It is not true mercy. It only looks to the criminal, but we must insist on mercy to society." And if your Honor please, the Court went on to hold, and in that case, that for criminals to go unpunished is a disgrace to our civilization, and we have reaped the fruits of it in the frequency in which the bloody deed occurs. They said that a "stern, unbending, unflinching administration of the penal laws, without regard to position or sex, that it is the highest mark of civilization, and it is also the surest mode to prevent the commission of offenses. *Id.*

Georgia law, Bowen was eligible for the death penalty.

That, however, does not end the inquiry. As we have seen, *see supra* pp. 678–79, the recent en banc decisions of this Court instruct that to determine whether improper arguments rendered a sentencing trial fundamentally unfair, we should ask whether there is a reasonable probability that, in the absence of those arguments, the death penalty would not have been imposed. *See, e.g., Brooks,* 762 F.2d 1402, 1413. "This inquiry involves an evaluation of the improper remarks in the context of the entire proceeding...." *Id.* at 1413.

■ The prosecutor improperly put before the jury his personal opinions. The principal thrust of his argument, however, made it clear that only the jury could decide whether or not Bowen should be executed. The prosecutor began his argument by stating that "it is necessary that you twelve jurors decide what punishment [Bowen] is to receive for the offense of murder." Tr. at 560. Further along in his argument the prosecutor conceded that "I'm willing to abide by your [the jury's] determination because it's a determination you [the jury] must make." Tr. at 577. He also said that "[t]he only place that Sheila Denise Young has to appeal to is you [the jury]." *Id.* at 579. Thereafter, the prosecutor specifically advised the jury that "in order to fulfill the commands of the law in this case you do whatever you wish." *Id.* at 580. The prosecutor concluded his argument by exhorting the jurors to search their consciences and souls and return a verdict of death, yet recognized that "[t]hat's a decision you [the jury] must make." *Id.* at 581.

The trial judge's instructions also made it abundantly clear that no one save the jury was responsible for the ultimate decision, life or death for Bowen. In the first paragraph of his charge, the judge instructed the jury that "[y]ou [the jury] have been empowered to fix the punishment for the offense for which [the defendant] has already been convicted." *Id.* at 605. In the

next paragraph, the judge charged that the jurors "are the judges of the law and facts of this case.... You are made the exclusive judges as to the credibility of witnesses." *Id.* The judge also charged the jury that even if the state proved the existence of an aggravating circumstance, the jury "would [still] be authorized to fix the punishment of the defendant at life imprisonment." *Id.* at 609. The judge further instructed that the verdict forms "are not in any manner to suggest to you what your verdict should or should not be. That is entirely up to you." *Id.* at 610.

In these circumstances, we have little difficulty concluding that the jury understood that it bore sole responsibility for the sentencing decision and that the prosecutor's opinions were no more than that. The improper statements of opinion were fairly isolated within the body of the prosecutor's argument, and represented only a small part thereof. Any prejudice from the improper remarks was for the most part alleviated by other statements of the prosecutor and the judge's charge. We find no reasonable probability that, absent the improper statements of opinion, Bowen would not have been sentenced to death.

■ Similarly, we hold that there is no reasonable probability that the prosecutor's invocation of the views of a "noted justice" changed the outcome of the sentencing hearing. First, as previously noted, the thrust of the prosecutor's own argument made it unmistakeably clear that the jury could do as it pleased. Bowen's counsel also emphasized the fact that, under Georgia law, the jury could opt for life rather than death, even if it found the existence of an aggravating circumstance, after considering all the circumstances. *See id.* 600–01 ("[E]ven if you find that this was a vile heinous act you still have the option because of considering the man of awarding that man a life sentence instead of a death sentence"); *id.* at 602 ("[I]f you consider the true Charlie Bowen ... as the evidence really pictures him, ... then ... you have the opportunity to award him a punishment of life in prison rather than being put to

death, even for the offense of murder"); *id.* at 604 ("[T]he law doesn't say you've got to put a man to death because he murdered somebody and I don't think Charlie Bowen deserves death and ... there's evidence here to show you that he doesn't deserve death"). Most importantly, the trial judge, when instructing the jury on mitigating circumstances, advised the jury that mitigating circumstances do not justify or excuse the offense, "but ... in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability." *Id.* at 607. The judge also charged the jury that despite the presence of aggravating circumstances, it could fix the punishment of Bowen at life imprisonment "for any reason that is satisfactory to you [the jury]." *Id.* at 609. The court further instructed the jury that their decision should be informed by "consideration [of] all the evidence, all the surrounding facts and circumstances, and the law as given you ... by the court." *Id.* at 610. Finally, as we stated in our discussion of the improper statements of personal opinion, the trial court made it very clear to the jurors that it was entirely up to them whether or not Bowen should be given a death sentence.[5]

The improper argument suggesting the judicial disapproval of mercy does not undermine our confidence in the outcome of the sentencing hearing. We accordingly reverse the district court's ruling that Bowen's sentencing hearing was rendered fundamentally unfair by improper prosecutorial argument.

## IV. COMPOSITION OF THE TRAVERSE JURY LIST

The district court concluded that Bowen was sentenced to die by a jury drawn from a list which unconstitutionally excluded women.[6] We agree.

▆▆▆▆▆ Decisions by the Supreme Court and this court make it clear that a defendant may challenge the discriminatory selection of state court juries under the equal protection clause of the fourteenth amendment, *see Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979); *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *United States v. Sneed,* 729 F.2d 1333 (11th Cir. 1984); *Gibson v. Zant,* 705 F.2d 1543 (11th Cir.1983), and the sixth amendment, which vouchsafes the right to be tried by a jury chosen from a group reflecting a fair cross-section of the community. *See Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *United States v. Tuttle,* 729 F.2d 1325 (11th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 968, 83 L.Ed.2d 972 (1985); *Gibson,* 705 F.2d 1543. We have noted that the equal protection analysis employs a prima facie case test virtually identical to the one used in the fair cross-section analy-

---

**5.** This case is easily distinguished from *Drake,* where the improper argument was found to have rendered the sentencing hearing fundamentally unfair. As an initial matter, a comparison of the argument in *Drake* and the argument made in the instant case, reveals that the latter argument is a more limited, if not rather garbled, version of the former. The prosecutor in *Drake* specifically invoked the office of the Supreme Court of Georgia in support of his argument. *See supra* note 4; *Drake,* 762 F.2d 1458. Here, the prosecutor referred only to a "noted justice." The prosecutor in *Drake* specifically stated that the Supreme Court of Georgia regarded the kind of mercy adverted to as not true mercy. *See supra* note 4; *Drake,* 762 F.2d 1458. Here, no mention was made of mercy, except that society occasionally should be the object of mercy, as well as a criminal defendant. The prosecutor in this case may have tried to quote the Georgia Supreme Court, but he obviously

was not successful. Finally, the prosecutor in *Drake* took pains to note that the quoted passages were taken from Georgia Supreme Court cases involving murder and the death penalty. The prosecutor in this case merely referred to the view of a "noted justice;" no mention was made of the context within which these views were expressed. From the foregoing, we consider the argument in *Drake* to be a much more severe statement concerning the appropriateness of mercy for a capital crime defendant, and therefore much more prejudicial than the inarticulate argument involved in this case.

**6.** Given its disposition of the gender discrimination claim, the district court found it unnecessary to address Bowen's companion claim that blacks also were unconstitutionally under-represented on the traverse jury list.

sis. *See Tuttle,* 729 F.2d at 1327 n. 2; *Gibson,* 705 F.2d at 1546; *United States v. Perez-Hernandez,* 672 F.2d 1380, 1384 n. 5 (11th Cir.1982).[7]

The Supreme Court delineated the contours of the equal protection challenge in *Castaneda,* where it stated:

The first step is to establish that the group is one that is a recognizable, distinct class.... Next the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as ... jurors, over a significant period of time.... Finally, ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.

*Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1280 (citations omitted); *Mitchell,* 443 U.S. at 565, 99 S.Ct. at 3005. More recently, the Supreme Court set forth the elements of a fair cross-section prima facie case. To prevail on a sixth amendment jury composition challenge:

[T]he defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren,* 439 U.S. at 364, 99 S.Ct. at 668. After carefully reviewing the record, we hold that the district court correctly concluded that Bowen established a fourteenth amendment prima facie case.[8]

Respondent concedes that since women constitute a recognizable, distinct class, *see Duren,* 439 U.S. at 364, 99 S.Ct. at 668 (citing *Taylor,* 419 U.S. at 531, 95 S.Ct. at 698); *Sneed,* 729 F.2d at 1335, the first prong of the *Castaneda* test has been satisfied. The gravamen of his quarrel with the district court, however, focuses on the weight the court accorded the statistical disparity between the percentage of women

7. The sixth and fourteenth amendment analyses do differ in one significant respect. To prevail on an equal protection challenge, the defendant must show purposeful discrimination. *Duren,* 439 U.S. at 368 n. 26, 99 S.Ct. at 670 n. 26. Hence, if the defendant makes out a prima facie case, the burden of proof then shifts to the state to show the absence of discriminatory intent. *Id.; Castaneda,* 430 U.S. at 495, 97 S.Ct. at 1280; *Gibson,* 705 F.2d at 1546 n. 4. Since, however, discriminatory intent is irrelevant to a fair cross-section challenge, *Duren,* 439 U.S. at 368 n. 26, 99 S.Ct. at 670 n. 26, the state may rebut a sixth amendment prima facie case only by demonstrating "that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury selection process ... that result in the disproportionate exclusion of a distinctive group." *Id.* at 367–68, 99 S.Ct. at 670–71 (footnote omitted); *see Willis v. Zant,* 720 F.2d 1212, 1217 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984); *Gibson,* 705 F.2d at 1546 n. 4; *Perez-Hernandez,* 672 F.2d at 1384 n. 5.

8. In his habeas petition, Bowen contended that the jury panel which sentenced him to death was drawn from a traverse jury list "composed in violation of the Constitution of the United States." Record, Vol. 1 at 18. Since Bowen failed to specify the constitutional basis for his complaint, the district court stated that it would evaluate the jury composition claim under both the sixth and fourteenth amendments. *Id.* at 210. The court accordingly set forth in its opinion the *Castaneda* and *Duren* tests. *Id.* at 210–11. Absent from the court's opinion, however, is any discussion of the burden the state must carry to rebut a sixth amendment prima facie case or any findings on whether respondent had done so in this case. Because we are wary of reaching an issue not ruled upon by the district court, we base our decision regarding the jury composition issue solely on fourteenth amendment grounds. We note, however, that curiously wanting from the record is any evidence offered by respondent concerning a significant state interest justifying the underrepresentation of women on the Polk County traverse jury lists. *See supra* note 7. This is puzzling since the record established prior to the district court's ruling is replete with references to sixth amendment fair cross-section cases. See, e.g., *Bowen v. State,* 260 S.E.2d at 858 (citation to *Duren* ); Respondent's Brief in Support of Answer and Return, Record, Vol. 1 at 26–29 (same); Magistrate's Report and Recommendation, *id.* at 136–41 (*Duren* prima facie case applied to facts of this case). In fact, Bowen, in response to a request by the magistrate, filed a pre-hearing brief in support of his contention that he need not show purposeful discrimination to establish a prima facie case. Brief of Petitioner, *id.* at 83.

residing in Polk County and the percentage of women on the traverse jury list.

Bowen was sentenced to die in 1978 by a jury drawn from the traverse jury list composed in the fall of 1977. The statistics admitted into evidence in the district court reflect a disparity of –22.7% between the percentage of women residing in the county and the percentage of women on the 1977 traverse jury list. The record further shows that this disparity was not an aberration; rather, the underrepresentation of women was even more dramatic in the four preceding traverse jury lists.[9]

In the face of this evidence of a clear historical pattern of female underrepresentation on Polk County's traverse jury lists,

respondent insists that the statistical disparities are not constitutionally significant. We do not agree.

We acknowledge that the Supreme Court has eschewed pronouncing precise mathematical standards for proving systematic exclusion of distinct classes, *see Alexander v. Louisiana,* 405 U.S. 625, 630, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972), and that we have followed its lead. *See, e.g., Gibson,* 705 F.2d at 1547; *Bryant v. Wainwright,* 686 F.2d 1373, 1376 (11th Cir.1982), *cert. denied,* 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983). We do not, however, write on a clean slate. In factually similar cases, the Supreme Court, this court, and the former Fifth Circuit[10] all

---

**9.** The disparities are arrived at by comparing 1970 Census Bureau statistics for Polk County to the Polk County traverse jury lists, which are revised every two years. Respondent does not

challenge this methodology. The district court based its ruling on the following breakdown by gender of the traverse jury pools and the county census figures:

### 1977 TRAVERSE JURY POOL

| Class | Number | % of pool | % of population | Disparity |
|---|---|---|---|---|
| Males | 1427 | 69.7% | 47.5% | [+] 22.2% |
| Females | 612 | 29.8 | 52.5 | [−] 22.7 |
| Sex Unknown | 8 | .5 | - | - |

### 1975 TRAVERSE JURY POOL

| Class | Number | % of pool | % of population | Disparity |
|---|---|---|---|---|
| Males | 1290 | 70.6% | 47.5% | [+] 23.1% |
| Females | 533 | 28.2 | 52.5 | [−] 24.3 |
| Sex Unknown | 4 | 2.2 | - | - |

### 1973 TRAVERSE JURY POOL

| Class | Number | % of pool | % of population | Disparity |
|---|---|---|---|---|
| Males | 1352 | 86.2% | 47.5% | [+] 38.7% |
| Females | 217 | 13.8 | 52.5 | [−] 38.7 |

### 1971 TRAVERSE JURY POOL

| Class | Number | % of pool | % of population | Disparity |
|---|---|---|---|---|
| Males | 1201 | 76.7% | 47.5% | [+] 29.2% |
| Females | 365 | 23.3 | 52.5 | [−] 29.2 |

### 1969 TRAVERSE JURY POOL

| Class | Number | % of pool | % of population | Disparity |
|---|---|---|---|---|
| Males | 1103 | 76.5% | 47.5% | [+] 29.0% |
| Females | 338 | 23.5 | 52.5 | [−] 29.0 |

Record, Vol. 1 at 212.

**10.** The Eleventh Circuit, in *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), adopted as precedent decisions of the

former Fifth Circuit handed down prior to October 1, 1981. We also are bound by decisions of Unit B of the former Fifth Circuit rendered after

have found statistical variances near the 22.7% disparity present in this case to be constitutionally significant. *E.g., Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) (23%); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (14%); *Gibson,* 705 F.2d 1543 (20% and 38%); *Machetti v. Linahan,* 679 F.2d 236 (11th Cir.1982) (36% and 42%), *cert. denied,* 459 U.S. 1127, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983); *Porter v. Freeman,* 577 F.2d 329 (5th Cir.1978) (20.4%). We therefore have no difficulty concluding that the 22.7% variance between the percentage of women residing in Polk County and the percentage of women on the 1977 traverse jury list, immediately preceded by nearly a decade of even greater underrepresentation, is sufficient to satisfy the second prong of the *Castaneda* test.

The district court also found that the process employed by the Polk County jury commissioners in composing the traverse jury list was susceptible of abuse as a tool of discrimination. We agree.

The Georgia law in effect when the 1977 traverse jury list was composed provided:

> At least biennially, or, if the senior judge of the superior court shall direct, at least annually, the board of jury commissioners shall compile and maintain and revise a jury list of intelligent and upright citizens of the county to serve as jurors. In composing such list the commissioners shall select a fairly representative cross section of the intelligent and upright citizens of the county from the official registered voters' list of the county as most recently revised by the county board of registrars or other county election officials. If at any time it appears to the jury commissioners that the jury list, so composed, is not a fairly representative cross section of the intelligent and upright citizens of the county, they shall supplement such list by going out into the county and personally acquainting themselves with other citizens of any significantly identifiable group in the county which may not be fairly represented thereon.

> After selecting the citizens to serve as jurors, the jury commissioners shall select from the jury list a sufficient number of the most experienced, intelligent and upright citizens, not exceeding two-fifths of the whole number, to serve as grand jurors. The entire number first selected, including those afterwards selected as grand jurors, shall constitute the body of traverse jurors for the county, except as otherwise provided herein, and no new names shall be added until those names originally selected have been completely exhausted, except when a name which has already been drawn for the same term as a grand juror shall also be drawn as a traverse juror, such name shall be returned to the box and another drawn in its stead.

Ga.Code Ann. § 59–106 (current version at Ga.Code Ann. § 15–12–40 (1982)). Although the Supreme Court has characterized this method of selection as "not inherently unfair," *Turner,* 396 U.S. at 355, 90 S.Ct. at 537, it also has recognized that the statute contained the potential for abuse. *Id.* at 356 & n. 14, 90 S.Ct. at 538 & n. 14. It is necessary therefore, to examine the testimony of the Polk County jury commissioners to determine whether the process they used to compose the traverse jury list was susceptible of abuse or not facially neutral.

Members of the jury commission testified both in the state trial court and in the district court. The following passage from the Georgia Supreme Court's summary of the state court jury composition hearing underscores the largely subjective approach taken by the jury commissioners:

> At the hearing on the jury challenge, several members of the Polk County Jury Commission were called to testify. Of the jury commissioners, four are white males, one is a white female, and one is a black male. The jury commissioners testified to the following effect: the appellant's jury was struck from a

that date. *Stein v. Reynolds Secs., Inc.,* 667 F.2d 33, 34 (11th Cir.1982).

traverse jury panel which had been most recently revised in September-October, 1977. The panel was drawn from a 1975 Polk County voters registration list, a list of county voters who had voted in the last general election, a list of persons under court jurisdiction, telephone books, and city directories. The primary source from which the jurors were drawn was the list of voters who had voted in the last election. The commission was given brief instructions from the Polk County Superior Court Judge, including an instruction to have males, females, blacks and whites on the jury list. *The commission met as a group and discussed each name considered. They were considered on the basis of each jury commission member's acquaintance with them—specifically on the basis of character, ability, and capability to be a juror. If everybody approved, the name would be placed on the jury list. The commission did not put anyone on the jury list about whom someone on the commission did not know something.* They did not take any investigative action to get to know people they did not know. (The jury commissioners were not aware of their duty, imposed by Code § 59–106 (1976 amendment), to supplement the jury list by going out into the county and personally acquainting themselves with other citizens of the county, if it appeared that the jury list, as composed, was not a fairly representative cross-section of the intelligent and upright citizens of the county.) Blacks were designated with "(c)" on the voters lists furnished to the panel, but all of them, particularly the black jury commissioner, knew pretty well the great majority of the black community. They did not know the percentages of male-female or black-white in Polk County, but no one was excluded from the traverse jury panel because of race, age or sex; and it was the aim of the jury commission to secure a cross-section of people from the community for the traverse jury panel.

*Bowen v. State,* 260 S.E.2d at 857–58 (emphasis added). At the federal habeas hearing, the jury commissioners who testified reiterated that no one was placed on the traverse jury list who was not personally known by one of the commissioners. The district court concluded that this method of selection was susceptible of abuse. Record, Vol. 1 at 215.

Respondent argues that in addressing the third prong of the *Castaneda* test, the district court improperly focused on only the subjective attributes of the selection process. Respondent urges that the court should have incorporated into its analysis (1) the fact that a woman and a black man were members of the 1977 jury commission; (2) the fact that the jury commissioners did not rely exclusively on the voters registration list to compose the traverse jury list; and (3) the commissioners' assertions that no one was excluded from the list solely on the basis of race or gender. Respondent also argues that the commissioners' collective familiarity with nearly everyone in the county could have prevented abuse of the method of selection. These arguments, however, miss the mark and evince a fundamental misunderstanding of both the third prong of the *Castaneda* test and the distinction between a prima facie case and a rebuttal case.

To fulfill the third requirement of *Castaneda,* Bowen was obliged to show that the traverse jury selection process used in 1977 contained the potential for abuse. Bowen clearly made such a showing: (1) the jury commissioners knew the gender of every potential juror; (2) the commissioners were, as a group, personally familiar with practically everyone in the county; and (3) the commissioners discussed amongst themselves the qualifications of each person considered. That a member of the jury commission was black or female, or that several sources were used to gather names, neither magically removes from this process its highly subjective component nor diminishes the ease with which the process could have been manipulated. The same is true of the jury commissioners' assertions that they did not discriminate. This testimony, properly viewed, is

at best an attempt to overcome the prima facie case of discrimination. Since the district court correctly concluded that Bowen established a *Castaneda* prima facie case, the only remaining question is whether or not the court erred in holding that respondent failed to rebut it.

■ To successfully rebut the prima facie showing of unconstitutional action, the state must present sufficient evidence to "dispel the inference of intentional discrimination." *Castaneda*, 430 U.S. at 497–98, 97 S.Ct. at 1281–82. Although there is no litmus test by which to judge a rebuttal case, it is clear that evidence in rebuttal must focus on "showing that permissible [gender] neutral selection criteria and procedures" have produced the underrepresentation of women on the traverse jury list. *Alexander*, 405 U.S. at 632, 92 S.Ct. at 1226; *Guice v. Fortenberry*, 722 F.2d 276, 280 (5th Cir.1984); *Perez-Hernandez*, 672 F.2d at 1387. While the testimony of alleged discriminators should not be summarily dismissed, *see Castaneda*, 430 U.S. at 498, 97 S.Ct. at 1282, it should be examined with a healthy amount of judicial scrutiny. *Perez-Hernandez*, 672 F.2d at 1387. Specifically, "affirmations of good faith in making ... selections are insufficient to dispel a prima facie case of systematic exclusion." *Alexander*, 405 U.S. at 632, 92 S.Ct. at 1226; *Castaneda*, 430 U.S. at 498 n. 19, 97 S.Ct. at 1282 n. 19; *Guice*, 722 F.2d at 280; *Gibson*, 705 F.2d at 1549. The district court applied these principles to the evidence before it, and properly found that respondent failed to carry his burden.

Respondent argues here, as he did unsuccessfully in the district court, that this case is distinguishable in crucial respects from *Alexander*, *Castaneda*, and their progeny. In support of his position, respondent again directs our attention to the fact that the jury commissioners were neither all white nor all male, to the commissioners' use of multiple sources to gather names of potential jurors, and to the commissioners' denials of discrimination and their asserted awareness of the duty to include on the traverse jury list a fair cross-section of the community. Respondent submits that if the aggregation of these facts does not constitute a successful rebuttal case, none really exists. We are compelled to disagree.

Initially, the fact that a black man and white woman were members of the 1977 jury commission may be irrelevant. The Supreme Court has made it clear that in examining a state's rebuttal case, a court may not presume that persons of a particular class would not discriminate against others of the same class. *Castaneda*, 430 U.S. at 500, 97 S.Ct. at 1283. Moreover, regardless of the number and nature of the sources utilized by the jury commissioners to compile names of potential jurors, the fundamental fact remains that "the opportunity to discriminate was presented at later stages in the [jury selection] process." *Alexander*, 405 U.S. at 632, 92 S.Ct. at 1226. When respondent's rebuttal case is thus reduced, we are left with the jury commissioners' denials of discrimination. True, the testimony of alleged discriminators is not *per se* insufficient to rebut an equal protection prima facie case. *See Perez-Hernandez*, 672 F.2d at 1387. It is, however, subject to being weighed by the trial court in considering all the evidence presented. There is a notable absence in this record of any adequate explanation for the clear pattern of female underrepresentation on the traverse jury lists in Polk County. The record provides ample support for the finding of the district court that respondent failed to overcome Bowen's prima facie case of purposeful discrimination. In the words of the Supreme Court, "the opportunity for discrimination was present and [it cannot be said] on this record that it was not resorted to by the commissioners." *Alexander*, 405 U.S. at 632, 92 S.Ct. at 1226 (*quoting Whitus v. Georgia*, 385 U.S. 545, 552, 87 S.Ct. 643, 647, 17 L.Ed.2d 599 (1967)).

## V. CONCLUSION

For the reasons stated in Section II(b), the judgment of the district court in grant-

ing habeas corpus relief on the *Sandstrom* claim is REVERSED.

For the reasons stated in Section III, the judgment of the district court in granting habeas corpus relief on the prosecutorial argument claim is REVERSED.

For the reasons stated in Section IV, the judgment of the district court in granting Bowen a new sentencing trial is AFFIRMED and the case REMANDED for the granting of appropriate relief. Bowen is entitled to a new sentencing proceeding before a properly empaneled jury.

JOHNSON, Circuit Judge, specially concurring in part and dissenting in part:

I concur in Section IV of the majority opinion, affirming the judgment of the district court in granting petitioner a new sentencing trial because he was sentenced by an unconstitutionally selected jury. I also concur in Section II(a) of the majority opinion, which holds that a *Sandstrom* violation occurred. However, I dissent from Section II(b) of the opinion, which holds the *Sandstrom* violation to be harmless error, and Section III, which holds that the petitioner was not prejudiced by improper prosecutorial argument at the sentencing trial.

## I. THE SANDSTROM ISSUE

I acknowledge that I am bound by the recent decisions of the *en banc* court in *Davis v. Kemp,* 752 F.2d 1515 (11th Cir. 1985) (en banc), and *Tucker v. Kemp,* 762 F.2d 1496 (11th Cir.1985) (en banc). However, the majority's opinion unjustifiably extends the harmless error concept to a case where the intent of the admitted killer was clearly at issue.

In *Davis,* the Court identified two circumstances under which the harmless error rule might be applicable to *Sandstrom* violations: (1) where the evidence of the defendant's guilt was overwhelming, and (2) where the invalid instruction concerned an element of the crime which was not at issue at trial. *Id.* at 1521; *Lamb v. Jernigan,* 683 F.2d 1332 (11th Cir.1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983). In *Davis,* the faulty instruction concerned the intent of the defendant, but the Court held that the defendant did not contest the issue of intent. *See Davis, supra,* 752 F.2d at 1521. The Court held that under those circumstances the faulty instruction, which impermissibly shifted the burden of proof on the intent issue to the defendant, was harmless error. In reaching its conclusion, the Court relied heavily on *Engle v. Koehler,* 707 F.2d 241 (6th Cir.1983), *aff'd by an equally divided court,* —— U.S. ——, 104 S.Ct. 1673, 80 L.Ed.2d 1 (1984) (per curiam), in which the Sixth Circuit held that a *Sandstrom* violation could be harmless error where the defendant admits that an intentional, malicious killing occurred but claims non-participation in the crime; but that such a violation could not be harmless error where the defendant asserts lack of *mens rea. See Davis, supra,* 752 F.2d at 1521; *Engle, supra,* 707 F.2d at 246.

Although intent was not contested in *Davis,* intent was very much at issue in the instant case. The petitioner raised a temporary insanity defense, which called into question his capacity to form the requisite intent for malice murder. This is the same defense that was raised in *Engle,* in which the Sixth Circuit held that a *Sandstrom* violation was not harmless error. 707 F.2d at 246. Nevertheless, the majority holds that the *Sandstrom* violation, which may have given some jurors the impression that the petitioner had the burden of proving that he lacked the requisite intent for malice murder, was harmless error.

The majority points out that the faulty jury instruction in this case stated that one is presumed to intend the natural and probable consequences of his acts *if he is a person of "sound mind".* The majority argues that this presumption could have become operative only if the jury first determined that the petitioner was sane, *i.e.,* if the jury had already rejected the petitioner's insanity defense. The majority concludes that if the presumption had become operative, and the *Sandstrom* violation thus occurred, the violation was rendered harmless by the fact that petitioner's de-

fense on the issue of intent had already been rejected by the jury.

The majority's analysis fails to address the fact that the State was required to prove not that petitioner had a sound mind but, rather, that he had the requisite intent for malice murder. Even if the jury rejected petitioner's argument of temporary insanity, the issue of intent was not a defense that petitioner had to prove; intent was an element of the crime that the State had the burden of proving beyond a reasonable doubt. *Davis, supra,* 752 F.2d at 1528 (Johnson, J., dissenting). By arguing that he had a diminished capacity to form the requisite intent for malice murder, defendant did not thereby admit that he had the requisite intent if he had the capacity to form it. Since intent was a contested issue, holding a *Sandstrom* error harmless in the present case is an unwarranted extension of the "harmless error" rule.

## II. THE PROSECUTORIAL MISCONDUCT ISSUE

In the present case, the prosecutor argued that a "noted justice" had stated that mercy would be an inappropriate consideration for the defendant. The prosecutor implored the jury to "fulfill the commands of the law," and thus inflict the death penalty on the defendant. The majority holds that, despite this concededly improper argument, the prosecutor did not render the sentencing phase of the trial fundamentally unfair, and appellant is not entitled to habeas relief on this ground. The majority relies on the "prejudice" test adopted by this Circuit in the *en banc* decision *Brooks v. Kemp,* 762 F.2d 1383, 1413 (11th Cir. 1985) (en banc), which held that a court should grant habeas relief for improper prosecutorial argument at the sentencing phase only if there is a reasonable probability that, in the absence of such argument, the death penalty would not have been imposed.

In holding that the improper prosecutorial argument was not grounds for relief, the majority disregards the recent Supreme Court decision in *Caldwell v. Mississippi,*

— U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), in which the Court vacated a death sentence because the prosecutor used the same kind of improper argument that was used in the present case. Because the recent Supreme Court decision rejects the "prejudice" test adopted in *Brooks,* I dissent from Section III of the majority opinion.

### A. *Caldwell* Rejects the *Brooks* Prejudice Test

In vacating the defendant's death sentence because of improper prosecutorial argument, the *Caldwell* Court applied a prejudice standard that differs significantly from the 11th Circuit standard formulated in *Brooks* and relied upon by the majority. In *Brooks,* the *en banc* court held that to determine whether to grant habeas relief for improper prosecutorial arguments the reviewing court must decide whether there is a reasonable probability that, had the remarks not been made, the sentencing outcome would have been different. *Brooks, supra,* at 1402. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Drake v. Kemp,* 762 F.2d 1449, 1458 (11th Cir.1985) (en banc); *Strickland v. Washington,* 466 U.S. 668, ——, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984).

The basis for the standard adopted in *Brooks* was the notion that habeas relief should be available only when an error has affected the "fundamental fairness" of the challenged proceeding. This "fundamental fairness" standard originated in *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). In that case, the Supreme Court set forth the standard for reviewing habeas corpus petitions raising the impropriety of a state prosecutor's argument in the *guilt* phase of a *noncapital* offense. In holding that the relevant inquiry was whether the remark violated due process, the majority stated that "not every trial error or infirmity ... constitutes a 'failure to observe that fundamental fairness essential to the very concept of

justice.' " *Brooks, supra,* at 1400, citing *Donnelly,* 416 U.S. at 642, 94 S.Ct. at 1871.

In order to elaborate on the fundamental fairness standard, the *Brooks* Court adopted the prejudice standard used by the Supreme Court in *Strickland v. Washington, supra.* The *Brooks* Court held that the Court in *Strickland,* "while addressing a specific Sixth Amendment violation, recognized that 'fundamental fairness' is the central concern of the writ of habeas corpus." *Brooks, supra,* at 1401, citing *Strickland,* 466 U.S. at ____, 104 S.Ct. at 2070, 80 L.Ed.2d at 700. The *Brooks* Court continued, "Thus, the [*Strickland*] Court acknowledged that fundamental fairness, the same standard adopted in *Donnelly,* is the governing principle in reviewing errors of counsel. The [*Strickland* Court's] use of the 'reasonable probability' test to elaborate the underlying principle suggests its applicability to other areas in which fundamental fairness is the guide." *Brooks, supra,* at 1401. In short, *Brooks* held that the standard used to test fundamental fairness in the context of ineffective assistance of counsel claims is equally applicable in the context of prosecutorial misconduct claims in capital cases.

In support of its adoption of the "reasonable probability" test, the *Brooks* Court argued that that test was "consistent with the standards discussed in *Donnelly* and with subsequent cases applying the fundamental fairness standard." *Id.* The Court claimed that those cases indicated that, in determining whether improper argument had a prejudicial impact on the sentencing proceeding, it was necessary to look beyond the types of argument used and to look at the strength of the evidence as well. The Court concluded, "Even argument greatly exceeding the bounds of propriety will not be fundamentally unfair in the guilt phase of a case with overwhelming evidence because of the low probability of the argument's impact." *Id.* at 1401–02 (footnote omitted).

The majority in the present case relies on the standard adopted in *Brooks* in determining that the improper prosecutorial argument was not a ground for vacating the death sentence. The majority holds that there was no reasonable probability that, absent the improper statements of the prosecutor, Bowen would not have been sentenced to death. *Supra* at 682.

In concluding that the prosecutor's remarks required reversal of the death sentence, the *Caldwell* Court did not refer to a "reasonable probability" standard. The Court consistently emphasized that the Eighth Amendment requires a heightened standard of reliability in the capital sentencing decision. *See Caldwell, supra,* — U.S. at ——, ——, 105 S.Ct. at 2639, 2646. The Court concluded, "Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires." *Id.* at ——, 105 S.Ct. at 2646.

The "reasonable probability" test adopted by the *en banc* court in *Brooks* is incompatible with *Caldwell* for three reasons. First, the "reasonable probability" test is inconsistent with the *Caldwell* Court's language in the final section of the majority opinion. The Court held that, for the sentencing phase to satisfy the Eighth Amendment's heightened standard of reliability, the reviewing court must be able to say that the improper argument "had no effect on the sentencing decision." *Id.* This is a far more difficult standard for the State to satisfy than the *Brooks* standard. Unlike the *Brooks* standard, which places the burden on the defendant to show prejudice, the *Caldwell* standard places the burden of proving the absence of prejudice on the State. Prejudice will be presumed unless the reviewing court can say that the improper argument had no effect on the jury's decision. *See id.* In addition, the State cannot overcome this presumption merely by showing that there is a "reasonable probability" that the improper argument did not affect the outcome. The State must prove that the improper argument "had no effect."

The second reason the *Brooks* standard is incompatible with *Caldwell* is that

*Brooks* treated the "reasonable probability" test as a monolithic standard to be applied in every habeas corpus proceeding, regardless of whether the error complained of occurred under the Fifth, Sixth, or Eighth Amendment. *See Brooks, supra,* at 1399–1401. In specifically alluding to the *heightened* need for reliability in the capital sentencing phase required by the Eighth Amendment, the *Caldwell* Court suggested that different prejudice tests are required for the various types of constitutional challenges to the fundamental fairness of a state trial. *Caldwell, supra,* ―― U.S. at ――, 105 S.Ct. at 2645.

The third reason the *Brooks* standard should no longer be followed is that, although that standard requires a reviewing court to take into account the strength of the evidence against the defendant, *Brooks, supra,* at 1401–02, the *Caldwell* Court looked solely at the type of argument used, in the context of the entire argument and instructions, in determining whether the sentencing phase might have been rendered unfair. The *Caldwell* Court did not take the strength of the evidence into account at all in determining whether the improper argument affected the fairness of the sentencing phase. *See Caldwell, supra,* ―― U.S. at ―― – ――, 105 S.Ct. at 2644–45. On the contrary, the Court suggested that a reviewing court could not accurately determine whether a jury might have returned a different sentence in the absence of improper argument. The Court said, "It is beyond question that an appellate court, performing its task with a presumption of correctness, would be relatively incapable of evaluating the 'literally countless factors that [a capital sentencer] consider[s]' ... in making what is largely a moral judgment of the defendant's desert." *Id.* at ―― n. 7, 105 S.Ct. at 2645 n. 7 (citation omitted). In short, the *Caldwell* Court applied a prejudice standard more closely resembling the harmless error test of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), than the prejudice test of *Strickland.*

In addition to indicating that the *Brooks* prejudice standard was wrongly adopted,

*Caldwell* indicates specific flaws in the way the *Brooks* standard has been applied. The dissent in *Caldwell* argued that the impact of the prosecutor's argument regarding appellate review was mitigated by later prosecutorial comments that the jury played an important role in the sentencing process. *Caldwell, supra,* ―― U.S. at ――, 105 S.Ct. at 2650 (Rehnquist, J., dissenting). However, the majority explicitly rejected this argument of the dissent, on the grounds that, "even if the prosecutor's later comments did leave the jury with [the] view that they had an important role to play, the prosecutor did not retract, or even undermine, his previous [improper comment]." *Caldwell, supra,* at ―― n. 7, 105 S.Ct. at 2645 n. 7. The Court also emphasized the fact that the trial judge failed to issue strong curative instructions directed specifically at the improper argument. *Id.* at ――, 105 S.Ct. at 2645.

The majority in the present case places heavy emphasis on the fact that "[a]ny prejudice from the improper remarks was for the most part alleviated by other statements of the prosecutor and the judge's charge." *Supra* at 682. The majority ignores the significance of the fact that neither the trial judge nor the prosecutor made any attempt to cure or retract the specific remarks that the majority concedes were improper. Yet, *Caldwell* clearly holds that general remarks to the effect that the jury bears responsibility for the sentencing decision are not sufficient to cure the prejudice caused by improper prosecutorial arguments aimed at diminishing the jury's sense of responsibility. *Caldwell, supra,* at ―― n. 7, 105 S.Ct. at 2645 n. 7.

### B. *Caldwell* Controls the Outcome in the Present Case

In *Caldwell,* the prosecutor argued that the jury would not bear responsibility for the imposition of a death sentence, because a death sentence would automatically be reviewed by an appellate court. The Court said that a capital sentencing jury, made up of individuals placed in a very unfamiliar

situation and called on to make a very difficult and uncomfortable choice, might welcome the opportunity to diminish the importance of its role and delegate its decision making authority to others. The Court said,

> This problem is especially serious when the jury is told that the alternative decision makers are the justices of the state supreme court. It is certainly plausible to believe that many jurors will be tempted to view these respected legal authorities as having more of a "right" to make such an important decision than has the jury.

*Id.* at ——, 105 S.Ct. at 2642.

The essence of the impropriety in *Caldwell* was the implication in the prosecutor's argument that the jury did not have the primary responsibility for deciding whether the death sentence was appropriate but, rather, that the jury had a *duty* to impose the death sentence in order to give effect to the decision of other authorities who were better able to judge the appropriateness of that penalty. Such authorities might include not only the justices of a state supreme court but also the prosecutor, grand jury, or police.

In the present case the prosecutor argued not only that a noted state supreme court justice had already determined that the death penalty was appropriate for the defendant, but also that the law itself commanded such a sentence. This argument went beyond what the Court condemned in *Caldwell.* Since the danger that the jury might choose to minimize the importance of its role was at least as high in the present case as it was in *Caldwell,* the analysis the Supreme Court used in deciding to vacate the death sentence in *Caldwell* should control the outcome in the present case. Because we cannot say that the improper arguments in the present case had no effect on the jury's sentencing decision, I dissent.

GEORGE C. YOUNG, District Judge, concurring in part and dissenting in part:

While concurring in the Court's analysis and conclusion on each of the *Sandstrom*

and the closing argument issues, I disagree that the petitioner is entitled to relief based on an alleged Fourteenth Amendment violation because of underrepresentation of women in the sentencing jury pool.

As the Court points out, challenges by criminal defendants in state court proceedings to the discriminatory selection of juries have been recognized under the Equal Protection Clause of the Fourteenth Amendment and the "fair cross-section" requirement implicit in the Sixth Amendment right to an impartial jury. The district court below held that Bowen, a male convicted of raping and murdering a twelve year old female, was denied equal protection of the laws in his sentencing because females were underrepresented on the 1977 traverse jury list from which his sentencing jury was selected. The district court thus found it unnecessary to evaluate Bowen's claim under the Sixth Amendment. In affirming the district court, the majority likewise purports to reach only the Fourteenth Amendment question.

In my opinion, both logic and Supreme Court precedent compel the conclusion that Bowen lacks standing to assert, on *equal protection* grounds, that women were underrepresented in the jury pool. In this regard, I would adopt the reasoning of Judge Gee, writing for the new Fifth Circuit, in *United States v. Cronn,* 717 F.2d 164 (5th Cir.1983). Petitioner's *own* equal protection rights obviously were not violated in this case by the alleged underrepresentation of women, and there is no justification for permitting *jus tertii* standing. *Id.* at 169–170.

I recognize that this Circuit has reached a contrary result in a line of cases beginning with *United States v. Perez-Hernandez,* 672 F.2d 1380, 1385–86 (11th Cir.1982), which, like *Cronn,* involve equal protection challenges to the selection of the grand jury foremen. *See also United States v. Holman,* 680 F.2d 1340, 1355–56 (11th Cir. 1982); *United States v. Cross,* 780 F.2d 631, 633–34 (11th Cir.1983); *United States v. Sneed,* 729 F.2d 1333, 1334 (11th Cir.

1984). The Fifth Circuit in *Cronn* persuasively points out that the "apparent conflict" among recent Supreme Court decisions, which this Court perceived in *Perez-Hernandez*, stems from a misreading of Justice Marshall's plurality opinion in *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972). The *Peters* opinion did not discuss standing "in an equal protection context," as *Perez-Hernandez* states (672 F.2d at 1385); indeed, the *Peters* Court did not reach the equal protection issue. 407 U.S. at 497 n. 5, 92 S.Ct. at 2165 n. 5. The discussion of standing in *Peters* pertains, rather, to grand jury composition challenges under the due process clause which—like Sixth Amendment, fair cross-section challenges to petit jury composition—may be raised by any criminal defendant, regardless of his circumstances. *Id.* at 504, 92 S.Ct. at 2169. *See Cronn*, 717 F.2d at 167–68, and nn. 4 and 6. Chief Justice Burger's dissent in *Peters* noted: "While the opinion of Mr. Justice Marshall refrains from relying on the Equal Protection Clause, it concludes that if petitioner's allegations are true, he has been denied due process of law." 407 U.S. at 509, 92 S.Ct. at 2172. In *United States v. Cross*, 708 F.2d at 633 n. 4, this Court acknowledged that the *Peters* plurality opinion "analyzed the exclusion of blacks from grand jury service *as a violation of due process.*" (Emphasis added).

On the other hand, in the equal protection cases of *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), and *Rose v. Mitchell*, 443 U.S. 545, 565, 99 S.Ct. 2993, 3005, 61 L.Ed.2d 739 (1979), the Supreme Court unequivocally stated that

> "in order to show an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of *his* race or the identifiable group *to which he belongs.*"

(Emphasis Added).

But whether *Perez* and its progeny were decided correctly or not, this panel is bound by it in the absence of a reversal by the Eleventh Circuit en banc or by an intervening contrary decision by the Supreme Court. *United States v. Holman*, 680 F.2d at 1356 n. 11. I construe *Hobby v. United States*, 468 U.S. ——, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984), as a contrary intervening decision which mandates a re-assessment of the *Perez* holding.

In *Hobby*, the Supreme Court evaluated the challenge of a white male to the underrepresentation of blacks and women in the position of grand jury foreman as a due process challenge. In holding that such discrimination would not warrant reversal of petitioner's conviction and dismissal of the indictment against him, the Supreme Court sought to distinguish its previous ruling in *Rose v. Mitchell, supra,* as follows:

> "Petitioners' reliance upon *Rose* is misplaced. *Rose* involved a claim brought by two Negro defendants under the Equal Protection Clause. As members of the class allegedly excluded from service as grand jury foremen, the *Rose* defendants had suffered the injuries of stigmatization and prejudice associated with racial discrimination. The Equal Protection Clause has long been held to provide a mechanism for the vindication of such claims in the context of challenges to grand and petit juries. *See, e.g., Castaneda v. Partida*, 430 U.S. 482 [97 S.Ct. 1272, 51 L.Ed.2d 498] (1977); *Hernandez v. Texas*, 347 U.S. 475 [74 S.Ct. 667, 98 L.Ed. 866] (1954); *Strauder v. West Virginia*, 100 U.S. 303 [10 Otto 303, 25 L.Ed. 664] (1880). Petitioner, however, has alleged only that the exclusion of women and Negroes from the position of grand jury foreman violates his right to fundamental fairness under the Due Process Clause. As we have noted, discrimination in the selection of federal grand jury foreman cannot be said to have a significant impact upon the due process interests of criminal defendants. Thus, the nature of petitioner's alleged injury and the constitutional basis of his claim distinguish his circum-

stances from those of the defendants in *Rose.*

\*  \*  \*  \*  \*  \*

Given the nature of the constitutional injury in *Rose*, the peculiar manner in which the Tennessee grand jury selection operated, and authority granted to the one who served as foreman, the Court assumed in *Rose* that discrimination with regard to the foreman's selection would require the setting aside of a subsequent conviction, 'just as if the discrimination proved has tainted the selection of the entire grand jury venire.' *Rose v. Mitchell, supra* [443 U.S.] at 551–52, n. 4 [99 S.Ct. at 2997–98, n. 4]. No such assumption is appropriate here, however, in the very different context of the due process challenge by a white male to the selection of foremen of federal grand juries."

—— U.S. at ——–——, 104 S.Ct. at 3098–99, 82 L.Ed.2d at 267–69.

*Hobby*, then, makes clear and firm the Supreme Court's previously stated requirement that a petitioner seeking to raise an equal protection challenge must be a member of the race or group allegedly underrepresented on juries or grand juries. By implication, one who is not a member of the underrepresented group lacks standing to raise such a challenge.

In addition, *Hobby* demonstrates that there is a difference in the evaluation of a due process violation claim from that of an equal protection violation claim. Discrimination in selection of a grand jury foreman could be an equal protection violation (*Rose v. Mitchell*, supra) but would not be a due process violation (*Hobby v. United States*, supra). Likewise, there may, in some cases of jury composition disparities, be a difference in the results depending upon whether the challenges are examined under the Fourteenth Amendment equal protection standard or the Sixth Amendment fair cross-section standard. Judge Fay has, for this Court, rested his decision solely on the Fourteenth Amendment claim and declined to decide the Sixth Amendment challenge

in the absence of findings or a ruling by the district judge on that issue.

For the reasons set forth above, I dissent to Part IV of the majority opinion; I would reverse the district court's grant of a new sentencing trial and would remand for a consideration of the issues unresolved in the district court including, but not limited to, the Sixth Amendment fair cross-section claim.